## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
## CASE NO. 1:19-cv-661

| | | |
|---|---|---|
| AUTUMN DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **COMPLAINT** |
| | ) | |
| UNIVERSITY OF NORTH CAROLINA AT | ) | |
| GREENSBORO, THE BOARD OF GOVERNORS | ) | |
| OF THE UNIVERSITY OF NORTH CAROLINA, | ) | |
| and RALEIGH SCHOOL OF NURSE | ) | |
| ANESTHESIA, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff Autumn Davis ("Ms. Davis") files this Complaint against Defendants University of North Carolina at Greensboro ("UNCG"), The Board of Governors of the University of North Carolina ("UNC Board") and Raleigh School of Nurse Anesthesia ("RSNA").

## PRELIMINARY STATEMENT

Surely in today's society, a female student can trust her academic institution – particularly one that has charged her tens of thousands of dollars in tuition – not to foster an environment where, among other things, male individuals rub their erect genitalia upon the student while performing clinical work towards her post-graduate degree. That same student also should feel safe after bravely and promptly reporting such disgusting sexual misconduct to appropriate individuals. These are not controversial statements. Rather, they constitute absolute minimum standards that should govern any rational, non-dysfunctional institution. The Defendants in this case disagree.

For more than two years now, the Defendants (actively or passively) have engaged in a comprehensive intimidation and retaliation campaign against Ms. Davis that should terrify any

student in higher education. Simply put, the UNC Board and its member institutions far too often blindly condone outdated philosophies instead of enacting meaningful change. Ms. Davis is the latest victim of these systemic failures, which need to be corrected immediately. It is for these reasons that Ms. Davis is filing the instant lawsuit.

## PARTIES, JURISDICTION & VENUE

1.      Defendant UNCG is a component of the University of North Carolina, a state institution and government body, established pursuant to the laws of the State of North Carolina. UNCG is located within this District.

2.      UNCG is a recipient of federal financial assistance for purposes of Section 504 of the Rehabilitation Act ("Section 504") and a public entity for purposes of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132(1)(B).

3.      As a public university, UNCG is a "person" subject to suit within the meaning of 42 U.S.C. § 1983 ("Section 1983").

4.      Defendant UNC Board is the policy-making body legally charged with the general determination, control, supervision, management and governance of all affairs of the constituent institutions.

5.      The UNC system is a single, unified state agency and the UNC Board has supervisory authority over the UNC system's member-institutions, including UNCG. Based upon these and other facts, the UNC Board and UNCG are joint entities and/or constitute a single entity under Title IX of the Education Amendments Act of 1972 ("Title IX") and other applicable laws.

6.      Defendant RSNA is a non-profit corporation duly organized under the laws of the State of North Carolina. On information and belief, RSNA's website appears linked to UNCG's

2

website and states that "[e]stablished in 1990, Raleigh School of Nurse Anesthesia was founded through the cooperative efforts of Rex Healthcare, WakeMed Raleigh, and Duke Raleigh Hospital due to the growing need of Certified Registered Nurse Anesthetists (CRNA) in North Carolina. RSNA's 36-month clinical and didactic curriculum offers students the opportunity to develop into safe and competent CRNA's by providing a course of study that encourages lifelong learning in the practice of nurse anesthesia."

7.    RSNA is a joint/single entity with UNCG under applicable law and otherwise acted in concert with UNCG or others as it relates to the unlawful conduct alleged herein.

8.    The Defendants in this case: (i) implemented and executed policies and customs resulting in the deprivation of Ms. Davis' constitutional, statutory and common-law rights; (ii) were responsible for ensuring that their employees are properly trained and supervised to perform their jobs; (iii) are responsible for the acts and omissions of their employees; (iv) were aware that Ms. Davis suffered sex-based discrimination and retaliation during the relevant time-period; (v) exhibited deliberate indifference to the unlawful discrimination and retaliation alleged herein; (vi) failed to provide employees with appropriate sexual harassment training as required by Title IX and applicable law; and (vii) created and/or condoned an educational environment allowing employees to suppress and joke about sexual harassment allegations instead of conducting appropriate investigations and implementing corrective action.

9.    Ms. Davis is a thirty-plus year old, Caucasian female. She resides within this District.

10.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and/or other law, which give district courts jurisdiction over all civil actions arising under the Constitution, laws or treaties of the United States. Claims are asserted under the laws of the

3

United States as well as pursuant to 28 U.S.C. § 1343(a)(4), in that claims are asserted under a law providing for the protection of civil rights. Further, this action asserts federal questions under Section 504, Title II of ADA and Title IX, as more fully set forth herein.

11. The Court further has jurisdiction under 42 U.S.C. § 1983 as this action seeks damages against Defendants for committing acts, under color of state law, with the intent and for the purpose of: (i) depriving Ms. Davis of rights secured under the Constitution and the laws of the United States; (ii) depriving Ms. Davis of procedural and substantive due process in conjunction with her dismissal from UNCG's Doctor of Nursing Practice program.

12. The declaratory and injunctive relief sought in this matter is authorized by 28 U.S.C. §§ 2201-02 and Federal Rules of Civil Procedure 57 and 65.

13. Venue lies in this Court pursuant to 28 U.S.C. § 1391 and/or other law. The acts and omissions giving rise to the causes of action alleged herein occurred in this District.

## FACTUAL ALLEGATIONS

**I.     In 2015, Ms. Davis Enrolls In UNCG's Doctor Of Nursing Practice Program**

14.     Ms. Davis has spent most of her adult life working towards a career goal of becoming a Certified Registered Nurse Anesthetist ("CRNA").  She graduated from Clemson University in 2006 with a BSN in Nursing.  For almost the next decade, she gained substantial experience in the medical field, with particular emphasis on anesthesia work.

15.     In August 2015, Ms. Davis enrolled in UNCG's Doctor of Nursing Practice ("DNP") program seeking to obtain a Master's of Science in Nursing ("MSN") degree with a concentration in nurse anesthesia.  As part of the DNP program, Ms. Davis also enrolled at RSNA, a non-profit associated with UNCG's program.  This was an exciting time for Ms. Davis, as completion of the three-year DNP program was the last step in her academic path before she could pursue lucrative job opportunities.

16.     The DNP program requires, among other things, the completion of academic courses and practicum courses, which are to be completed in a supervised clinical setting through RSNA.

17.     Specifically, and as it relates to practicum courses, UNCG and RSNA assigned Ms. Davis to perform clinical work at local North Carolina hospitals – including Rex Hospital and WakeMed Hospital – as a Student Registered Nursing Anesthetist.  When performing clinical work, Ms. Davis was supervised by a CRNA (also referred to as a supervising preceptor) employed at the attending hospital.

5

## II. Key Individuals At UNCG And The UNC Board

18.     Dr. Robin Remsburg is the Dean of UNCG's School of Nursing. In this capacity and as a state actor, she had final discretion to make decisions, take action and/or develop policies on UNCG's behalf. She also had final discretion to decide the internal appeals described herein that were lodged by Ms. Davis.

19.     Dr. Kelly Burke is the Dean of UNCG's Graduate School. In this capacity and as a state actor, she had final discretion to make decisions, take action and/or develop policies on UNCG's behalf. She also had final discretion to decide the internal appeals described herein that were lodged by Ms. Davis.

20.     Dr. Franklin D. Gilliam, Jr. is UNCG's Chancellor. In this capacity and as a state actor, Dr. Gilliam oversees all policies and procedures for the university. He had final discretion to make decisions, take action and/or develop policies on UNC. He also had final discretion to make decisions relating to Ms. Davis' enrollment at UNCG.

21.     As early as August 2018 and on multiple occasions thereafter, Ms. Davis complained directly to Chancellor Gilliam about the unlawful conduct summarized herein. The Chancellor never responded to Ms. Davis' complaints.

22.     Jerry D. Blakemore is UNCG's General Counsel and serves as a state actor in this capacity. At all relevant times, Mr. Blakemore and/or UNCG's Legal Department office have been (or should have been) aware of the unlawful conduct described herein, but have taken no action to investigate or remedy the conduct.

23.     Harry Smith, Jr. is the Chair of the UNC Board and serves as a state actor in this capacity. At all relevant times, Mr. Smith and/or the UNC Board have been (or should have been) aware of the unlawful conduct described herein, but have taken no action to investigate or

remedy the conduct.

24.     Thomas C. Shanahan is the Senior Vice-President and General Counsel for the UNC Board and serves as a state actor in this capacity. At all relevant times, Mr. Shanahan and/or the UNC Board's Legal Department have been (or should have been) aware of the unlawful conduct described herein, but have taken no action to investigate or remedy the conduct.

### III.    Defendants' History Of Turning A Blind Eye Towards Sexual Harassment And Engaging In Unlawful Retaliation

25.     UNCG's website boasts that its DNP program "has a diverse and experienced faculty who are committed to excellence in teaching and support of students." It appears that the phrase "support of students" should be taken with a grain of salt.

26.     On information and belief: (i) before July 2016, multiple female students in the DNP program lodged sexual harassment and/or related complaints while training as Registered Nurses at local North Carolina hospitals; (ii) some or all of these complaints were made against the same male CRNA, who on information and belief continues to remain employed within the UNC Healthcare System; and (iii) each of the named Defendants were aware and/or should have been aware of the pre-July 2016 complaints.

27.     Simply put, female students in the DNP program have a history of suffering sexual harassment, which was known or should have been known by each of the Defendants.

28.     Even worse, some or all of the Defendants have a history of blatantly retaliating against (or allowing retaliation to be taken against) UNCG students who engage in protected conduct by, among other things, reporting unlawful discrimination. In fact, one such case was pending before the Court until recently. See Emanuelson v. The University of North Carolina at Greensboro, et. al., Case No. 17-534 (M.D.N.C.).

7

29.     At all relevant times, UNCG (including but not limited to its Human Resources Department, its Legal Department and its General Counsel Jerry Blakemore), the UNC Board (including but not limited to its General Counsel Thomas Shanahan) and RSNA were and have been aware of the unlawful sexual harassment and retaliation alleged herein, and have refused to take appropriate steps to investigate and remedy the unlawful conduct.

## IV.     UNCG Applies Its Student Appeal Procedures Inconsistently, Inappropriately And/Or In Bad-Faith

30.     During the relevant time-period, UNCG – with the knowledge and/or consent of the UNC Board -- has repeatedly and intentionally: (i) failed to timely process student appeals; (ii) operated its student appeal procedures in an unfair and inequitable manner; and (iii) otherwise failed to administer its student appeal procedures in a manner that affords due process under the law.

31.     To the contrary, UNCG has unlawfully manipulated its own processes and procedures to confuse students and ensure that valid disputes are not brought to the attention of the appropriate bodies.

32.     Because of how UNCG implements its student appeal procedures, as alleged herein, UNCG's student appeal procedures are a "sham" and do not provide an appropriate procedural mechanism for resolving disputes, under the due process clause or otherwise.

33.     There are no binding administrative remedies applicable to Ms. Davis' dispute with Defendants.

34.     Some or all of the Defendants have waived any potential defense of state sovereign immunity based upon the allegations contained herein.

8

## V. Ms. Davis Experiences Substantial Sexual Harassment And Bravely Reports The Harassment To UNCG

35.     Dr. Nancy Shedlick is the Program Administrator in charge of UNCG's DNP program.  Dr. Shedlick's husband, Ray Shedlick, was (and, on information and belief, still is) the Director of Anesthesia at Rex Hospital, one of the hospitals where Ms. Davis performed her clinical work.

36.     Dr. Linda Stone is the RSNA Assistant Program Administrator of the DNP program and one of Dr. Shedlick's direct reports.

37.     In July 2016, and as part of her clinical studies for the DNP program, UNCG assigned Ms. Davis to work as a Student Registered Nursing Anesthetist at WakeMed Raleigh Hospital.  During this period, Ms. Davis was supervised by a particular male CRNA.

38.     Throughout the time Ms. Davis performed her clinical work at WakeMed Raleigh, the particular male CRNA repeatedly: (i) made sexually suggestive and otherwise inappropriate jokes to Ms. Davis.  For example, on one occasion where a female patient was under anesthesia, the male CRNA stated in front of Ms. Davis that, ***"man, the surgeon can take as long as he wants in this case, it's a nice view.  When I saw her tits, I mean man."***; (ii) ***asked Ms. Davis to strip for him***; (iii) asked Ms. Davis out on dates, even after she asked him to stop doing so; and, most disturbingly (iv) ***pushed his erect penis against Ms. Davis' body while she was working***.

39.     On information and belief, and based upon information provided to Ms. Davis at the time, other former/current DNP program students had lodged complaints about unlawful sexual discrimination towards them and Defendants were otherwise aware that the DNP program had a propensity for condoning unlawful sexual harassment.

40.     Like any reasonable person, Ms. Davis was mortified by the particular male

9

CRNA's conduct and suffered substantial distress as a result, to the point of being diagnosed with anxiety and depression.

41.     Nevertheless, she bravely and promptly reported this unlawful conduct (including the sexual harassment and physical assault referenced above) to Dr. Shedlick and Dr. Stone in July 2016.

42.     Dr. Shedlick's and Dr. Stone's response to Ms. Davis' complaint was telling and consistent with Defendants' history of unlawful conduct, as alleged herein.  Specifically, upon receiving Ms. Davis' complaint, and instead of expressing sympathy for Ms. Davis and/or acknowledging that corrective action would occur: (i) Dr. Stone pointedly asked Ms. Davis, "are you sure you want to make this type of complaint?" in an attempt to intimidate Ms. Davis and otherwise cause her to withdraw her complaint; (ii) Dr. Shedlick and Dr. Stone intentionally downplayed the particular male CRNA's conduct and tried to claim it somehow was "accidental."; and (iii) Dr. Shedlick and Dr. Stone pressured Ms. Davis not to share her complaint with anyone else.

43.     Ms. Davis did not withdraw her complaint and yet no meaningful investigation of the complaint ever occurred.

44.     Incredibly, on approximately October 31, 2016, Defendants assigned Ms. Davis to work with the particular male CRNA for her clinical work.  Ms. Davis again complained, including to Shelly Schaad (Chief CRNA at the hospital) and asked why she was assigned to the male CRNA notwithstanding his past conduct towards her.  Ms. Schaad advised that neither Dr. Shedlick, Dr. Stone nor anyone else had advised her or the hospital about Ms. Davis' sexual harassment complaint and/or that the hospital should restrict interactions between Ms. Davis and the male CRNA.  Ms. Schaad then directed Ms. Davis to speak again to Dr. Shedlick and Dr.

Case 1:19-cv-00661-WO-JLW   Document 1   Filed 07/02/19   Page 10 of 27

Stone and obtain their authorization for restrictions on her contacts with the male CRNA.

45.     Ms. Davis followed Ms. Schaad's instructions, including by sending an email dated November 1, 2016.  In that email, Ms. Davis explicitly advised Ms. Stone that "[e]very encounter with [the male CRNA] has escalated, and the last encounter left me feeling sexually exploited for weeks."

46.     Ms. Stone provided no support to Ms. Davis.  Instead, she and Dr. Shedlick reprimanded Ms. Davis for going "outside the chain of command" by bringing this issue to Ms. Schaad's attention.  Ms. Stone further stated that notwithstanding all that had occured, Ms. Davis needed to understand that "you may work with [the male CRNA] when assigned to Wake as he works the call schedule.  This means that you may be assigned with him on off-shifts."

## VI.     UNCG Further Discriminates Against Ms. Davis In Violation Of The Americans With Disabilities Act

47.     Ms. Davis suffers from ADHD and is otherwise protected by the ADA and Section 504.  This has been known to some or all of the Defendants during the relevant time-period.

48.     Based upon her protected condition, Ms. Davis requested reasonable accommodations from UNCG, including extended time for completing exams and placement in a quiet environment when taking exams to limit interruptions.

49.     Although UNCG ostensibly "granted" Ms. Davis' accommodation requests, it intentionally took steps to ensure the accommodations were not implemented properly.  Indeed, Dr. Stone and Dr. Shedlick (among others) repeatedly interrupted Ms. Davis during testing and otherwise ensured that she did not take exams in a quiet working environment.

50.     Even worse, Dr. Stone and Dr. Shedlick frequently mocked Ms. Davis' disability in front of other students and yelled at Ms. Davis before exams due to her requested

11

accommodations.  Incredibly, Dr. Stone and Dr. Shedlick then threatened to have Ms. Davis dismissed from the DNP program if she complained about any of their conduct towards her.

51.     Notwithstanding Dr. Stone's and Dr. Shedlick's ridiculous threats, Ms. Davis bravely lodged a complaint with UNCG's Office of Accessibility and Resources Services ("OARS") concerning the University's disability discrimination and retaliation.

52.     As described more fully below, Dr. Stone and Dr. Shedlick subsequently followed through on their retaliation threats against Ms. Davis.

## VII.    UNCG's Two-Plus Year Retaliation Campaign Against Ms. Davis

53.     Based upon the protected conduct summarized above, Defendants' discriminatory and retaliatory animus towards Ms. Davis increased exponentially.  As a result, and throughout 2017 and 2018, UNCG (through Dr. Shedlick, Dr. Stone and others) engaged in a near daily campaign to inflict maximum harm upon Ms. Davis, a student who had engaged in protected conduct under the ADA, Title IX and other laws.

54.     Simply by way of example, on multiple occasions in 2017 and 2018, UNCG unlawfully attempted to have Ms. Davis removed from the DNP program and/or pressure her to quit the program by: (i) continuing to assign Ms. Davis to perform clinical work at WakeMed hospital (where the male CRNA referenced above worked), sometimes under the male CRNA's direct supervision; (ii) having Dr. Shedlick and Dr. Stone falsely claim that Ms. Davis was not "fit for duty" for DNP program purposes, despite no medical evidence supporting their claims. This occurred as recently as June 2018; (iii) fabricating documents to make it appear as though Ms. Davis was not completing her clinical work correctly.  This occurred as recently as January 2019; (iv) having Dr. Shedlick and Dr. Stone falsely accuse Ms. Davis of insubordination in June 2018; and (v) having Dr. Shedlick and Dr. Stone repeatedly advise students that they were doing

12

everything they could to have Ms. Davis dismissed from the DNP program.

55.     Consistent with the above, on multiple occasions during 2017 and 2018, Dr. Shedlick and/or Dr. Stone made comments to Ms. Davis like, "if I can't get rid of you for this [latest fabricated reason], I can get rid of you for something else."

### A.     Ms. Davis' Unlawful Dismissal From The DNP Program In June 2018

56.     In June 2018, *approximately one (1) month before Ms. Davis was to complete the DNP program and receive her degree*, Dr. Shedlick, Dr. Stone and/or others orchestrated Ms. Davis' summary dismissal from the DNP program for knowingly false reasons.  The stated reason for Ms. Davis' dismissal was unsafe nursing practices – a reason not related to academics. Thereafter, Ms. Davis timely appealed her dismissal with UNCG's Appeal Committee.

57.     At the time of her June 2018 dismissal, Dr. Shedlick, Dr. Stone and others knew or should have known that Ms. Davis had accepted a lucrative post-graduation job position starting in November 2018 that was contingent upon Ms. Davis obtaining her Doctor of Nursing Anesthesia Practice degree.

58.     Although UNCG scheduled appeal hearings in August 2018 and October 2018, it conducted the hearings in violation of Ms. Davis' due process rights under state and federal law, including N.C. Gen. Stat. § 116-40.11.

59.     N.C. Gen. Stat. § 116.40.11 states, among other things, that students who are "accused of a violation of the disciplinary or conduct rules . . . shall have the right to be represented, at the student's expense, by a licensed attorney or non-attorney advocate who may fully participate during any disciplinary procedure or other procedure adopted and used by the constituent institution regarding the alleged violation."

60.     Upon information and belief, the Student Handbook outlining RSNA appeal

procedures also entitled Ms. Davis to have an attorney present at the relevant appeal hearings.

61.     At each step of her respective appeals, Ms. Davis advised UNCG that she wanted to retain and/or had retained counsel to represent her, and further requested that counsel be permitted to participate in any hearings.  In every instance, UNCG summarily denied Ms. Davis' request, as well as her request for a non-attorney advocate who could fully participate in any hearings.

62.     During the appeal hearings: (i) Ms. Davis was not allowed to call or question witnesses; (ii) UNCG presented evidence not previously disclosed to Ms. Davis before the hearings; and (iii) UNCG relied upon records that were not part of Ms. Davis' student file or otherwise provided to her before the hearings and that were used to support her dismissal from the DNP program.  Even after the hearings, UNCG ignored Ms. Davis' requests (including requests made pursuant to FERPA) to provide records that were cited at the appeal hearings.

63.     As a practical matter, UNCG effectively precluded Ms. Davis from having any meaningful participation in the appeal hearings, in violation of her constitutional and other rights.

64.     In October 2018, UNCG's Appeals Committee ostensibly upheld Ms. Davis' appeal and ordered her reinstatement to the DNP program effective January 2019.  However, the procedures contained in the Appeals Committee's decision concerning Ms. Davis' purported remedies were arbitrary, capricious and otherwise in violation of Ms. Davis' rights.

65.     As a direct result of the above timeline of events, Ms. Davis lost the opportunity to commence working at a job in November 2018 that would have paid her more than $150,000 in annual salary.  Instead, she had to re-enroll in the DNP program for the Spring 2019 semester and pay UNCG an additional $10,000 in tuition costs for an extra semester.

14

**B.**   **Only One Month After "Reinstating" Ms. Davis In January 2019, UNCG Again Summarily And In Bad-Faith Dismisses Her From The DNP Program**

66.     Between October 2018 and January 2019, UNCG represented to Ms. Davis that it would implement her reinstatement to the DNP program in good-faith.  Ms. Davis reasonably relied upon UNCG's material representations and consequently continued to pay tuition and fees to UNCG for the DNP program.

67.     Unbeknownst to Ms. Davis, and notwithstanding the Appeals Committee's October 2018 decision, UNCG had no intention of reinstating Ms. Davis in good-faith and instead intended to fabricate reasons for dismissing Ms. Davis again from the program as soon as possible after her reinstatement.

68.     In February 2019 – only one month into her "reinstatement" – UNCG again summarily dismissed Ms. Davis from the DNP program for knowingly false reasons based upon purported unsafe nursing practices.  Again, the dismissal was for reasons other than academics and was done without affording Ms. Davis the appropriate notice and opportunity to be heard.

69.     To support its pretextual reasons for summarily dismissing Ms. Davis, UNCG again altered, falsified and/or destroyed records (including medical records).

70.     Similar to her first dismissal, Ms. Davis followed the lengthy appeal procedures promulgated by UNCG and/or RSNA.

71.     At each step of her respective appeals, Ms. Davis advised UNCG that she wanted to retain and/or had retained counsel to represent her, and further requested that counsel be permitted to participate in any hearings.  In every instance, UNCG summarily denied Ms. Davis' request, as well as her request for a non-attorney advocate who could fully participate in any hearings.

72.     During the appeal hearings: (i) Ms. Davis was not allowed to call or question

15

witnesses; (ii) UNCG presented evidence not previously disclosed to Ms. Davis before the hearings; and (iii) UNCG relied upon records that were not part of Ms. Davis' student file or otherwise provided to her before the hearings and that were used to support her dismissal from the DNP program. Even after the hearings, UNCG ignored Ms. Davis' requests (including requests made pursuant to FERPA) to provide records that were cited at the appeal hearings.

73.    As a practical matter, UNCG effectively precluded Ms. Davis from having any meaningful participation in the appeal hearings, in violation of her constitutional and other rights.

74.    In early 2019, Ms. Davis' counsel reminded UNCG and the UNC Board of the widespread unlawful conduct being taken against Ms. Davis and requested appropriate relief. UNCG and the UNC Board ignored Ms. Davis' counsel's communications.

75.    UNCG acted arbitrarily, capriciously and in bad-faith in denying Ms. Davis' appeal at each step, including based upon written correspondence and determinations made by Dr. Remsburg and Dr. Burke as recently as late May 2019.

76.    The actions of Defendants in arbitrarily and capriciously dismissing Ms. Davis (or allowing Ms. Davis to be dismissed) from the DNP Program constitute unlawful retaliation and have resulted in severe economic losses for Ms. Davis.

77.    Ms. Davis is experiencing irreparable harm and is threatened with continued irreparable harm in that her dismissal from the program deprives her of her legal right to attend classes in pursuit of a master's degree and career as Nurse Anesthesia.

78.    Ms. Davis has no adequate remedy at law for said irreparable harm in that Ms. Davis' damages cannot be totally determined or accurately sustained. Moreover, Ms. Davis' harm cannot be adequately compensated with monetary damages.

**FIRST CLAIM FOR RELIEF**
**(Title IX – Sex Discrimination & Sexually Hostile Educational Environment)**

79.     Paragraphs 1 through 78 above are realleged and incorporated herein by reference.

80.     Defendants, through their actions and inactions fostered and condoned a sexually hostile educational environment that victimized and damaged Ms. Davis.

81.     Ms. Davis reported and otherwise complained about the unlawful sex discrimination taken against her.

82.     The sex-based harassment summarized herein was so severe, pervasive and objectively offensive that it deprived Ms. Davis of access to educational opportunities or benefits provided by Defendants.

83.     Defendants' officials at the highest levels knew or should have known of the hostile environment within UNCG's DNP program but did nothing to investigate or remedy the misconduct – when action was required by law.

84.     Defendants, individually and collectively, are responsible for setting and approving public policy at UNCG and/or administering such policies.  At all relevant times, UNCG's policies, including complaint procedures, training and reporting, and response procedures were in violation of Title IX.

85.     Defendants have engaged in a pattern and practice of conduct designed to discourage and dissuade students from seeking protection from sex-based discrimination and retaliation.

86.     Defendants' failure to act, failure to provide federally mandated procedures and protections, created a sexually hostile educational environment for Ms. Davis.

87.     The harassment and hostile environment which Defendants fostered and

17

condoned operated to deny and/or limit Ms. Davis' ability to participate in or benefit from the DNP program.

88.     Defendants' officials responded to reports of sexual harassment with referrals to inadequate resolution procedures and suggestions that the victim somehow was at fault.

89.     Defendants left Ms. Davis to her own skills to avoid further victimization.

90.     Despite the increased burdens on Ms. Davis, as alleged herein, Defendants held her to a higher standard than her male peers.  Women, including Ms. Davis, were treated different in the DNP program than their male peers.

91.     Wherefore, Ms. Davis has been injured as a result of Defendants' actions in that she has suffered economic loss, damage to her professional reputation, loss of professional opportunity, emotional distress and damage to her health.

## SECOND CLAIM FOR RELIEF
### (Title IX – Retaliation for Reporting, Opposing and Attempting to Remedy a Sexually Hostile Educational Environment)

92.     Paragraphs 1 through 91 above are realleged and incorporated herein by reference.

93.     Ms. Davis engaged in protected activity under Title IX, including by reporting, opposing and/or attempting to remedy the unlawful conduct referenced herein.

94.     Ms. Davis faced numerous forms of retaliation throughout her academic experience based upon her reporting, opposing and attempting to remedy Title IX violations, including the adverse actions alleged herein.

95.     Ms. Davis Title IX protected activity was a determinative factor in Defendants' decision(s) to take adverse actions against her.

96.     Defendants treated Ms. Davis less favorably than other similarly-situated students

18

outside of her protected class(es).

97.     Due to Defendants' retaliatory actions, Ms. Davis has incurred substantial
damages, including economic loss, damage to her professional reputation, loss of professional
opportunity, emotional distress and damage to her health.

98.     The conduct, acts and omissions of Defendants constitute malicious, willful and
wanton conduct or are in reckless disregard and indifference to Ms. Davis' rights.

**THIRD CLAIM FOR RELIEF**
**(42 U.S.C. § 1983 – Equal Protection)**

99.     Paragraphs 1 through 98 above are realleged and incorporated herein by
reference.

100.    Ms. Davis is a female and a former graduate student of UNCG, a state institution
bound by the Constitution to provide equal protection of the laws.

101.    The conduct of UNCG employees condoned and fostered by Defendants was
intentional and was sufficiently severe or pervasive as to interfere unreasonably with Ms. Davis'
educational activities.

102.    Defendants and/or their agents acted under color of state law and according to
policies and procedures under their control.

103.    Due to Defendants' retaliatory and unlawful actions, Ms. Davis has incurred
substantial damages, including economic loss, damage to her professional reputation, loss of
professional opportunity, emotional distress and damage to her health.

**FOURTH CLAIM FOR RELIEF**
**(42 U.S.C. § 1983 – Due Process Violations)**

104.    Paragraphs 1 through 103 above are realleged and incorporated herein by
reference.

105.    Ms. Davis had a constitutionally protected liberty and property interest in completing the educational degree she sought to obtain from UNCG.

106.    Ms. Davis' reputation and future career also constitute a constitutionally recognized property interest.

107.    Ms. Davis' summary dismissal from the DNP program was arbitrary and capricious, motivated by bad-faith and had the effect of depriving Ms. Davis of her rights to continued education, her reputation and her career.

108.    Defendants and/or their agents acted under color of state law and according to policies and procedures under their control.

109.    Defendants made false charges and allegations about Ms. Davis and left her with no other mechanism to clear her name but this litigation.

110.    Further, because Ms. Davis' dismissal was not based on academic grounds, but was effectively a dismissal for misconduct, she must be afforded notice and an opportunity to be heard.

111.    Defendants denied Ms. Davis due process by creating and/or overseeing a constitutionally inadequate scheme that:

      a.    Excluded her attorney from a university disciplinary hearing despite Ms. Davis requesting that her attorney attend and state law providing the right to one;

      b.    Discouraged Plaintiff from offering a defense to her appeal of her dismissal;

      c.    Prevented Plaintiff from calling or questioning witnesses;

      d.    Used ambush evidentiary practices to catch Plaintiff off guard in presenting her case;

      e.    Disregarded evidence of unfair treatment to Plaintiff;

20

f.      Disregarded university appeal procedures in denying Plaintiff's second appeal;

g.      Offered a process that was fundamentally unfair to Plaintiff.

h.      Dismissed Plaintiff from the DNP program on arbitrary and capricious grounds;

i.      Failed to provide sufficient notice to Plaintiff of the allegations and evidence to be used against her; and

j.      Other acts to be proven at trial.

112.    The actions alleged in the above paragraph further denied Ms. Davis the ability to participate in a meaningful time in a meaningful manner at the appeal hearings referenced herein, as they interfered prejudicially with her ability to defend herself from the allegations resulting in her dismissal.

113.    Ms. Davis is precluded from seeking monetary damages under 42 U.S.C. § 1983 against a government entity, and the only remedy at law available to Ms. Davis is equitable relief.  As such, Ms. Davis has no remedy at law available and equitable relief is appropriate.

114.    Ms. Davis' dismissal from the DNP program is an irreparable injury that likely precludes her re-admittance to the program through ordinary means and prevents her from entering a comparable program at another institution to seek the same degree she was seeking at UNCG.

115.    Ms. Davis has expended significant resources, time and effort in obtaining a degree from UNCG in nurse anesthesia.  Ms. Davis completed all necessary steps to obtain such a degree except for a few weeks of clinical courses.

116.    The decision to dismiss Ms. Davis and not provide her with an opportunity to remediate was motivated by bad-faith and was in retaliation for her advocacy and protected activity and not related to her academic performance.

21

117.     Due to Defendants' actions, Ms. Davis has incurred substantial damages,

including economic loss, damage to her professional reputation, loss of professional opportunity,

emotional distress and damage to her health.

## FIFTH CLAIM FOR RELIEF
### (N.C. Const. Art. I, Sec. 19)

118.     The allegations in Paragraphs 1 through 117 are realleged and incorporated herein

by reference.

119.     Pursuant to the N.C. Const. Art. I, Sec. 19, Ms. Davis has a liberty and property

interest in completing the degree she sought to obtain from Defendants.

120.     Defendants acted under color of state law in dismissing Ms. Davis from the DNP

program.

121.     Defendants denied Ms. Davis due process by creating a constitutionally

inadequate scheme that:

   a.     Excluded her attorney from a university disciplinary hearing despite Ms. Davis requesting that her attorney attend and state law providing the right to one;

   b.     Discouraged Plaintiff from offering a defense to her appeal of her dismissal;

   c.     Prevented Plaintiff from calling or questioning witnesses;

   d.     Used ambush evidentiary practices to catch Plaintiff off guard in presenting her case;

   e.     Disregarded evidence of unfair treatment to Plaintiff;

   f.     Disregarded university appeal procedures and denying Plaintiff's second appeal;

   g.     Offered a process that was fundamentally unfair to Plaintiff.

   h.     Dismissed Plaintiff from the DNP program on arbitrary and capricious grounds;

22

i.    Failed to provide sufficient notice to Plaintiff of the allegations and evidence to be used against her; and

j.    Other acts to be proven at trial.

122.    The actions alleged in the above paragraph further denied Ms. Davis the ability to participate at a meaningful time in a meaningful manner at the hearing on the appeal of her dismissal, as they interfered prejudicially with her ability to defend herself from the allegations resulting in her dismissal.

123.    Ms. Davis' dismissal from the DNP program is an irreparable injury that likely precludes her re-admittance to the program and prevents her from entering a comparable program at another institution to seek the same degree she was seeking at UNCG.

124.    Ms. Davis has expended significant resources, time and effort in obtaining a degree from UNCG in nurse anesthesia.  Ms. Davis has completed all necessary steps to obtain such a degree except for completion of a few weeks of clinical courses.

## SIXTH CLAIM FOR RELIEF
### (Americans with Disabilities Act)

125.    The allegations in Paragraphs 1 through 124 are realleged and incorporated herein by reference.

126.    UNCG is a public entity within the meaning of Title II of the ADA, 42 U.S.C. § 12131.

127.    RSNA acted in concert with UNCG and itself also violated Ms. Davis' rights under the ADA.

128.    Ms. Davis was a qualified disabled individual within the meaning of Title II of the ADA, 42 U.S.C. § 12131.

129.    Defendants regarded Ms. Davis as having a mental impairment that limits a major

23

life activity (including learning and working), affecting her ability to successfully complete the MSN program.

130.    Ms. Davis was and is qualified for the MSN program at UNCG.

131.    With reasonable accommodation, Ms. Davis was and is capable of completing her Master's degree.

132.    Defendants discriminated against Ms. Davis by treating her differently than other students based upon her disability.

133.    Specifically, Defendants discriminated against Plaintiff by refusing to allow her reasonable accommodations, which it allowed to other disabled students.

134.    Defendants discriminated against Ms. Davis by refusing to help her resolve the harassment and discrimination she endured at her clinical rotations.

135.    Defendants discriminated against Ms. Davis by dismissing her from the DNP program.

136.    Defendants discriminated against Ms. Davis by refusing to readmit her to the DNP program.

137.    Defendants' actions constitute a continuing violation of the ADA.

**SEVENTH CLAIM FOR RELIEF**
**(Disability Discrimination In Violation Of Section 504)**

138.    The allegations in Paragraphs 1 through 137 are realleged and incorporated herein by reference.

139.    UNCG is covered by Section 504 of the Rehabilitation Act, as it receives federal financial assistance.  RSNA is also covered for the same reason.

140.    Ms. Davis was a qualified disabled individual within the meaning of Section 504.

141.    Ms. Davis was and is qualified for the MSN program at UNCG.

24

142.    With reasonable accommodation, Ms. Davis was and is capable of completing the MSN program, with a concentration in anesthesiology.

143.    Defendants discriminated against Ms. Davis by treating her differently than other students based upon her disability.

144.    Ms. Davis engaged in protected activity under Section 504.

145.    Defendants engaged in retaliatory actions when it dismissed Plaintiff.

146.    Defendants' actions in dismissing Ms. Davis were sufficient to deter a person of ordinary firmness from exercising his or her rights.

147.    Ms. Davis was dismissed as a direct result of her protected activity.

148.    Specifically, Defendants discriminated against Plaintiff by refusing to allow her reasonable accommodations, which it allows to other disabled students.

149.    Defendants discriminated against Ms. Davis by refusing to help her resolve the harassment and discrimination she endured at her clinical rotations.

150.    Defendants discriminated against Ms. Davis by dismissing her from the DNP program.

151.    Defendants discriminated against Ms. Davis by refusing to readmit her to the DNP program.

152.    Defendants' actions constitute a continuing violation of Section 504.

<u>**EIGHTH CLAIM FOR RELIEF**</u>
**(Unjust Enrichment)**

153.    The allegations in Paragraphs 1 through 152 are realleged and incorporated herein by reference.

154.    Ms. Davis conferred benefits upon the Defendants, as alleged herein.

155.    The benefits were not conferred officiously and were justified.

25

156.    The benefits were not made or offered gratuitously.

157.    The benefits provided are measurable and Defendants consciously accepted the benefits.

158.    The benefits provided by Ms. Davis were otherwise conferred on the Defendants under circumstances which give rise to a legal or equitable obligation on the part of the Defendants to account for the benefits received.

WHEREFORE, Ms. Davis respectfully requests the following relief:

a.    The Court grant a temporary injunction reinstating Ms. Davis to the UNCG Nurse Anesthesia program and RSNA;

b.    The Court grant a permanent injunction reinstating Ms. Davis to the UNCG Nurse Anesthesia program and RSNA;

c.    That she recover from Defendants compensatory, punitive and/or other damages as allowed by law, plus interest allowed by law, in an amount to be determined at trial;

d.    That she recover from Defendants the reasonable costs of attorneys' fees incurred in the prosecution of this action, plus interest as allowed by law;

e.    That all costs of this action be taxed against Defendants;

f.    That all issues in this case be tried by a jury; and

g.    For such other and further relief that the Court deems appropriate.

26

Respectfully submitted this 2nd day of July, 2019.

                             **THE NOBLE LAW FIRM, PLLC**

                             */s/ Nicholas J. Sanservino, Jr.*
                             Nicholas J. Sanservino, Jr.  (N.C. Bar No. 36557)
                             141 Providence Road, Suite 210
                             Chapel Hill, N.C. 27514
                             Telephone:    (919) 251-6008
                             Facsimile:    (919) 869-2079
                             nsanservino@thenoblelaw.com
                             *Attorneys for Plaintiff*