No. 1:19-cv-661-WO-JLW

| | |
|---|---|
| AUTUMN DAVIS, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>UNIVERSITY OF NORTH )<br>CAROLINA AT GREENSBORO, )<br>THE BOARD OF GOVERNORS )<br>OF THE UNIVERSITY OF )<br>NORTH CAROLINA, and )<br>RALEIGH SCHOOL OF NURSE )<br>ANESTHESIA, )<br>)<br>Defendants. | **MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS OF DEFENDANTS UNIVERSITY OF NORTH CAROLINA AT GREENSBORO AND BOARD OF GOVERNORS OF THE UNIVERSITY OF NORTH CAROLINA** |

NOW COME Defendants University of North Carolina at Greensboro ("UNCG") and the Board of Governors of the University of North Carolina ("the Board") (collectively, the "University Defendants"), and provide this Memorandum of Law in Support of their Motion to Dismiss.

## STATEMENT OF THE CASE

Plaintiff Autumn Davis ("Plaintiff") filed her Complaint against the University Defendants and the Raleigh School of Nurse Anesthesia ("RSNA") on July 2, 2019. (D.E. 1)  The Complaint asserted eight separate claims for relief: (1) Sex Discrimination and Sexually Hostile Educational Environment in violation of Title IX; (2) Retaliation for Reporting, Opposing and Attempting to Remedy a Sexually Hostile Educational Environment in violation of Title IX; (3) a claim brought pursuant to 42 U.S.C. § 1983 for

1

a violation of Plaintiff's rights to equal protection under the law; (4) a claim brought pursuant to 42 U.S.C. § 1983 for violations of Plaintiff's rights to due process of law; (5) a claim brought under state law for violations of Plaintiff's due process rights as guaranteed by Article I, § 19 of the North Carolina Constitution; (6) a claim under the Americans with Disabilities Act for discrimination on the basis of a disability; (7) a claim under § 504 of the Rehabilitation Act for discrimination on the basis of a disability; and (8) a state law claim for unjust enrichment.[1]  (D.E. 1)  The University Defendants now move to dismiss.

## STATEMENT OF THE FACTS[2]

In August 2015, Plaintiff enrolled at UNCG to obtain a Doctor of Nursing Practice ("DNP") degree with a concentration in nurse anesthesia.  (D.E. 1, ¶ 15)  The DNP program operated in conjunction with RSNA, an entity associated with UNCG.  (*Id.*)

DNP program students must complete both academic and practicum courses. Practicum courses are completed in supervised, clinical settings arranged by the program. (*Id.* at ¶ 16)  Plaintiff performed clinical work in North Carolina hospitals, including Rex Hospital and WakeMed Raleigh Hospital ("WakeMed"), as a Student Registered Nurse Anesthetist.  (*Id.* at ¶ 17)  While performing this clinical work, Plaintiff was supervised by a Certified Registered Nurse Anesthetist ("CRNA") employed at the hospital.  (*Id.*)

Dr. Nancy Shedlick ("Shedlick") is the Program Administrator for the DNP program; Dr. Linda Stone ("Stone") is the Assistant Program Administrator and reports

---

[1] For the sake of consistency with the Complaint, these claims for relief will be referred to by the same numeric designations assigned to them by Plaintiff ("First Claim for Relief," "Second Claim for Relief," etc.).

[2] The factual allegations in the Complaint and cited to in this brief are taken as true only for the purposes of the University Defendants' motion to dismiss.

Case 1:19-cv-00661-WO-JLW   Document 9   Filed 09/23/19   Page 2 of 25

directly to Shedlick. (*Id.* at ¶¶ 35, 36) In July 2016, Plaintiff was assigned to perform clinical work at WakeMed, during which she was supervised by one particular male CRNA ("the CRNA"). (*Id.* at ¶ 37) According to Plaintiff, the CRNA engaged in conduct she considered to be sexual harassment and she reported this conduct to Shedlick and Stone sometime in July 2016. (*Id.* at ¶¶ 38, 41) Plaintiff alleges that Stone attempted to get her to withdraw the complaint and that Shedlick and Stone both downplayed the conduct as accidental and pressured Plaintiff not to share her complaint with others. (*Id.* at ¶ 42) Plaintiff further asserts that no one meaningfully investigated the allegations. (*Id.* at ¶ 43)

On October 31, 2016, Plaintiff was assigned by the Chief CRNA at WakeMed to work with the CRNA. (*Id.* at ¶ 44) When Plaintiff approached the Chief CRNA and asked why the CRNA had been assigned to supervise her, the Chief CRNA responded that no one had advised her of Plaintiff's complaint about the CRNA or that interactions between him and Plaintiff should be restricted. (*Id.*) The Chief CRNA instructed Plaintiff to contact Shedlick and Stone, which Plaintiff did the following day via e-mail. (*Id.* at ¶¶ 44, 45) In that e-mail, Plaintiff advised Shedlick and Stone that "every encounter with [the CRNA] has escalated, and the last encounter left me feeling sexually exploited for weeks." (*Id.* at ¶ 45) According to Plaintiff, Shedlick and Stone "reprimanded" her for bringing the issue to the attention of the Chief CRNA. (*Id.* at ¶ 46)

Plaintiff suffers from ADHD. (*Id.* at ¶ 47) Plaintiff requested – and received – from UNCG reasonable accommodations (extended time for completing exams and a quiet testing environment). (*Id.* at ¶¶ 48, 49) According to Plaintiff, however, Shedlick and Stone interfered with these accommodations by repeatedly interrupting her during testing

and ensuring Plaintiff lacked a quiet test-taking environment. (*Id.* at ¶ 49) In addition, Plaintiff alleges, Shedlick and Stone "mocked" her disability in front of other DNP program students, yelled at Plaintiff prior to scheduled exams, and threatened to dismiss Plaintiff from the program if she complained. (*Id.* at ¶ 50) Nevertheless, at some point thereafter, Plaintiff alleges she filed a formal complaint with UNCG's Office of Accessibility and Resources Services ("OARS") about the perceived discrimination and retaliation. (*Id.* at ¶ 51)

According to Plaintiff, "throughout 2017 and 2018, UNCG . . . engaged in a near daily campaign to inflict maximum harm upon" her for having engaged in activity protected by the ADA, Title IX and "other laws." (*Id.* at ¶ 53) This campaign allegedly included: (1) continuing to assign Plaintiff to work at WakeMed, where she occasionally worked under the CRNA's direct supervision; (2) in June 2018, Shedlick and Stone falsely claiming Plaintiff was not "fit for duty;" (3) in June 2018, Shedlick and Stone falsely accusing Plaintiff of insubordination; (4) in January 2019, fabricating documents to suggest Plaintiff was not completing clinical work correctly; and (5) Shedlick and Stone advising DNP students that they were doing what they could to have Plaintiff dismissed from the program. (*Id.* at ¶ 54) Plaintiff also alleges that Shedlick and Stone, on multiple occasions, told her they could get rid of her. (*Id.* at ¶ 55)

In June 2018, Plaintiff was dismissed from the DNP program for unsafe nursing practices and Plaintiff appealed. (*Id.* at ¶ 56) In October 2018, UNCG reinstated Plaintiff to the DNP program effective January 2019. (*Id.* at ¶ 63) Plaintiff's re-enrollment cost her an additional $10,000 in tuition expenses. (*Id.* at ¶ 65)

4

In February 2019, UNCG again dismissed Plaintiff for unsafe nursing practices, which Plaintiff claims were false and supported by records UNCG "altered, falsified and/or destroyed." (*Id.* at ¶¶ 68-69)  Plaintiff again appealed, and requested UNCG permit her to have counsel represent her in the proceedings. (*Id.* at ¶¶ 70, 71)

In "early 2019," Plaintiff's counsel "reminded UNCG and [the Board] of the widespread unlawful conduct being taken against" Plaintiff and "requested appropriate relief." (*Id.* at ¶ 74)  UNCG upheld Plaintiff's dismissal in late May 2019. (*Id.* at ¶ 75)

## DISMISSAL STANDARD

Plaintiff's claims should be dismissed under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

In a Rule 12(b)(1) challenge to subject matter jurisdiction, the pleadings merely constitute evidence on the issue and materials outside the pleadings, if considered, do not convert the motion to one for summary judgment. *Evans v. B. F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999) (citations omitted).  The plaintiff bears the burden of proving subject matter jurisdiction exists. *Id.*

A complaint will survive a Rule 12(b)(6) motion if it contains "sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A complaint states a facially plausible claim "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  However, the court need not consider "legal conclusions, elements of a cause of action and bare assertions devoid of further factual enhancement[,]"

5

nor "'unwarranted inferences, unreasonable conclusions, or arguments.'" *Nemet Chevrolet Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009) (citations omitted). Moreover, the court should not presume a plaintiff can establish facts not actually alleged or assume that defendants have violated the law in ways other than those claimed. *Estate Constr. Co. v. Miller & Smith Holding Co.*, 14 F.3d 213, 221 (4th Cir. 1994) (citations omitted).

## ARGUMENT

### I. PLAINTIFF'S THIRD, FOURTH, FIFTH AND EIGHTH CLAIMS FOR RELIEF ARE BARRED BY ELEVENTH AMENDMENT IMMUNITY.

#### A. Plaintiff's Claims Pursuant to 42 U.S.C. § 1983

In her Third and Fourth Claims for Relief, Plaintiff seeks to recover against the University Defendants for alleged violations of her rights to equal protection under the laws and to due process. (D.E. 1 at 19) However, the immunity provided by the Eleventh Amendment to the United States Constitution bars those claims.

The Fourth Circuit has not clarified "whether a dismissal on Eleventh Amendment immunity grounds is a dismissal for failure to state a claim under Rule 12(b)(6) or a dismissal for lack of subject matter jurisdiction under Rule 12(b)(1)." *Andrews v. Daw*, 201 F.3d 521, 524 n.2 (4th Cir. 2000). When a court relies solely on the pleadings to resolve the Eleventh Amendment immunity issue, it may evaluate the pleadings under either Rule. *Jennette v. Beverly*, No. 5:15-CT-3019-D, 2015 U.S. Dist. LEXIS 152450, at *6 (E.D.N.C. Nov. 9, 2015).

Case 1:19-cv-00661-WO-JLW   Document 9   Filed 09/23/19   Page 6 of 25

The Eleventh Amendment expressly provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another state[.]" U.S. Const. amend. XI. The immunity extends to any suit seeking to impose liability which the State must pay from public funds. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989). Moreover, the immunity also applies to "state agents and state instrumentalities" and operates as a bar to the suit itself, not just a defense to liability. *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 479, 482 (4th Cir. 2005). Also, § 1983 creates a private right of action only against a "person" who deprives an individual of constitutional rights under color of state law. *Will*, 491 U.S. at 65-66. Neither a State nor a state agency is "a 'person' within the meaning of § 1983." *Id.*

UNCG is a constituent institution of The University of North Carolina. N.C.G.S. § 116-4 (2017). The Board itself is "a body politic and corporate" and also, therefore, an agency of the State. N.C.G.S. § 116-3 (2017). The Board and UNCG are both clearly and unambiguously state agencies, not persons, and are accordingly entitled to the protection of the Eleventh Amendment here. The Fourth Circuit has explicitly determined that the provisions of G.S. § 116-3 do not waive any immunity guaranteed by the Eleventh Amendment, nor do they provide any indication that North Carolina has consented to suit in federal court. *Huang v. Board of Governors of Univ. of North Carolina*, 902 F.2d 1134, 1138-39 (4th Cir. 1990) (affirming district court's dismissal of plaintiff's claims under § 1983 seeking money damages from the UNC Board of Governors for alleged due process and free speech violations), *reh'g denied*, 1990 U.S. App. LEXIS 13966 (4th Cir. June 12,

7

1990) (en banc); *Costello v. Univ. of N.C. at Greensboro*, 394 F. Supp. 2d 752, 761 (M.D.N.C. 2005) (granting University's motion to dismiss § 1983 claim that its policies violated plaintiff's constitutional rights by failing to accommodate his disability). Because the Eleventh Amendment renders both UNCG and the Board immune from suit, this Court should dismiss Plaintiff's Third and Fourth Claims for Relief[3] brought pursuant to 42 U.S.C. § 1983.

## B. Plaintiff's North Carolina Constitutional Claim

In her Fifth Claim for Relief, Plaintiff alleges that the University Defendants denied her due process in the course of implementing the appeal hearing procedures and, in doing so, also violated her rights under Article I, Section 19 of the North Carolina Constitution. (D.E. 1, ¶¶ 119-24) Eleventh Amendment immunity bars this claim as well.

In *Guseh v. North Carolina Central University, ex. rel. the Board of Governors of the University of North Carolina*, this Court interpreted the plaintiff's vague reference to the North Carolina Constitution as "likely" indicating an intent to sue under the "law of the land clause" contained in Article I, Section 19. 423 F. Supp. 2d 550, 561 (M.D.N.C. 2005), *aff'd*, 206 F. App'x 255 (4th Cir. 2006). This Court noted, however, that the Supreme Court of the United States has held that "the Eleventh Amendment bars a pendent claim

---

[3] In the Fourth Claim for Relief, Plaintiff acknowledges that she is "precluded from seeking monetary damages under 42 U.S.C. § 1983 against a government entity, and the only remedy at law available to [her] is equitable relief." (D.E. 1, ¶ 113) However, Plaintiff also alleges that, "[d]ue to Defendants' actions, [she] has incurred substantial damages, including economic loss, damage to her professional reputation, loss of professional opportunity, emotional distress and damage to her health." (D.E. 1, ¶ 117) Given the absence of any clarification elsewhere regarding the particular relief Plaintiff seeks for a purported violation of her due process rights, the University Defendants interpret the Fourth Claim for Relief to be one seeking money damages.

against state agencies and officers seeking prospective injunctive relief for a violation of state law." *Id.* (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 103-17 (1984)). Accordingly, this Court granted summary judgment to the University. *Id.* at 561. This Court should dismiss Plaintiff's Fifth Claim for Relief for the same reason. *See also Maisha v. Univ. of N.C.*, No. 1:12CV371, 2013 U.S. Dist. LEXIS 43224, at *8 (M.D.N.C. Mar. 27, 2013) (dismissing plaintiff's Law of the Land Clause claim on Eleventh Amendment immunity grounds).

### C. Plaintiff's Unjust Enrichment Claim

In her Eighth Claim for Relief, Plaintiff alleges that the University Defendants were unjustly enriched. Once again, the immunity provided to the University Defendants by the Eleventh Amendment deprives this Court of jurisdiction. *Pfouts v. N.C. Cent. Univ.*, No. 1:02CV0016, 2003 U.S. Dist. LEXIS 4643 at *1 (M.D.N.C. Mar. 24, 2003) (dismissing on Eleventh Amendment immunity grounds an expelled law student's claims against the university for violations of due process, negligence, and unjust enrichment).

## II. PLAINTIFF'S FIRST CLAIM FOR RELIEF FAILS TO PLEAD FACTS SUFFICIENT TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED FOR SEX DISCRIMINATION OR A SEXUALLY HOSTILE EDUCATIONAL ENVIRONMENT UNDER TITLE IX.

To state a claim under Title IX predicated on sexual harassment, a plaintiff must show the following: (1) that she was a student at an educational institution that receives federal funds; (2) she was subjected to harassment based upon her sex; (3) the harassment was sufficiently severe and pervasive to create a hostile (or abusive) environment in an educational program or activity; and (4) there is a basis for imputing liability to the

9

institution. *Jennings v. UNC*, 482 F.3d 686, 695 (4th Cir. 2007). Here, Plaintiff clearly fails to satisfy the fourth element of such a claim and this Court should therefore dismiss it.

In her Complaint, Plaintiff alleges that "throughout the time [she] performed her clinical work at WakeMed," the CRNA "repeatedly . . . made sexually suggestive and otherwise inappropriate jokes to her," asked her to strip for him, "asked [her] out on dates" even after she asked him to stop, and "pushed his erect penis against [her] while she was working." (D.E. 1, ¶ 38) Plaintiff claims to have reported this harassment to Shedlick and Stone "in July 2016" (D.E. 1, ¶ 41), but fails to allege any subsequent incidents of similar jokes, propositions, or inappropriate touching by the CRNA – or anyone else – at any time thereafter. Additionally, Plaintiff does not indicate how long prior to reporting the conduct she had been assigned to WakeMed, nor does she allege how frequently during that clinical rotation she interacted with the CRNA, let alone how often he directly supervised her.

A covered institution can be liable under Title IX for its "deliberate indifference to known acts of harassment in its programs or activities" if the harassment "is so severe, pervasive and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 633 (1999). Liability cannot attach, however, unless "an official who . . . has authority to address the alleged discrimination and to institute corrective measures . . . has actual knowledge of discrimination in the [institution's] programs and fails adequately to respond[,]" or displays "deliberate indifference" to discrimination. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998); *Davis*, 526 U.S. at 644 (institution "cannot be

10

directly liable for its indifference where it lacks the authority to take remedial action"). The institution's deliberate indifference must "cause [the plaintiff] to undergo harassment" or "make [her] liable or vulnerable" to it. *Davis*, 526 U.S. at 644-45. Moreover, an institution can only be liable when it "exercises substantial control over both the harasser and the context in which the known harassment occurs." *Davis*, 526 U.S. at 645. Liability can also attach when the institution's response to the known harassment is "clearly unreasonable." *Id.* at 648.

### A. <u>Knowledge of the University Defendants</u>

Tellingly, Plaintiff makes no allegations that the University Defendants knew of any previous harassment committed **<u>against her</u>** by the CRNA or anyone else or that she at any time notified the Board of any perceived harassment. These omissions, alone, are fatal to her claim for relief. *Baynard v. Malone*, 268 F.3d 228, 237-38 (4th Cir. 2001) (holding that absence of evidence that school principal specifically knew that plaintiff-student being abused precluded school being found liable under Title IX); *Facchetti v. Bridgewater Coll.*, 175 F. Supp. 3d 627, 639 (W.D. Va. 2016) (plaintiff did not state claim of deliberate indifference against college based on allegations of five on-campus sexual assaults of other students in previous year).

Plaintiff instead tries a more general approach, alleging upon information and belief that "other former/current DNP program students had lodged complaints about unlawful sexual discrimination." (D.E. 1, ¶ 39) Plaintiff boldly asserts – without a single supporting factual allegation – not only that "Defendants have engaged in a pattern and practice of conduct designed to discourage and dissuade students from seeking protection from sex-

Case 1:19-cv-00661-WO-JLW   Document 9   Filed 09/23/19   Page 11 of 25

based discrimination and retaliation" (D.E. 1, ¶ 85), but also that their failures to act "created a sexually hostile educational environment for" her (D.E. 1, ¶ 86). Yet, Plaintiff fails to allege whether any male students were among those harassed. *McLean v. Duke Univ.*, 376 F. Supp. 3d 585, 600-01 (M.D.N.C. 2019) (granting motion to dismiss based upon absence of allegations that male students who reported assaults were treated more favorably than plaintiff, depriving Court of any basis to suggest plaintiff was subjected to discrimination on the basis of sex). Plaintiff also fails to allege the nature or the type(s) of harassment any DNP program students allegedly endured, the locations, circumstances, or time frames in which the alleged harassment occurred, who harassed them or, more importantly, whether any of those victims reported the harassment to the University Defendants. Such a paucity of detail renders Plaintiff's allegations nothing more than either unsubstantiated speculation or a recitation of the elements of the cause of action itself, neither of which deserve credence by this Court. *Nemet Chevrolet, Ltd.*, 591 F.3d at 255. Plaintiff has not pled any facts demonstrating knowledge by the University Defendants of sexual harassment or discrimination sufficient to impute liability against them. *Gebser*, 524 U.S. at 290.

**B.      No interference with Plaintiff's educational opportunities**

A sexual harassment victim can be considered to have been deprived of access to educational opportunities or benefits when the harassment: (1) results in the physical exclusion of the victim from an educational program or activity; (2) "so undermines and detracts from the victim's educational experience" as to "effectively den[y her] equal access to an institution's resources and opportunities"; or (3) has a "concrete, negative

12

effect on [the victim's] ability" to participate in an educational program or activity. *Davis*, 526 U.S. at 650-51, 654. Here, however, the Complaint contains no allegation that the CRNA's alleged sexual harassment itself caused Plaintiff's exclusion from the DNP program. Nor does Plaintiff allege that the purported physical or mental health effects of the sexual harassment in July 2016 caused her to suffer performance issues, substantially detracted from her educational experience, or otherwise adversely affected her ability to complete the requirements of the DNP program.

### C.  No control over the harasser or the environment

As for the University Defendants' ability to exert control over the harasser or the context in which the harassment occurred, Plaintiff's threadbare allegations again fall short. Plaintiff claims that "UNCG assigned her" to the facilities where she performed clinical work (D.E. 1, ¶ 37), but also clearly pleads that any CRNA who supervised her during a clinical placement was "employed at the attending hospital" (D.E. 1, ¶ 17). Plaintiff fails to allege how the employing hospitals assigned CRNAs to supervise DNP program students, which hospital employees made the assignments, or what role, if any, the University Defendants or their employees had in the process. The Complaint utterly lacks any allegations that the University Defendants had the authority to take remedial action against a CRNA who Plaintiff alleges was employed by WakeMed, to exercise control over CRNA/student supervision assignments, or to in any way influence the clinical work environment. For these reasons, too, Plaintiff's First Claim for Relief fails. *See, e.g.*, *McLean*, 376 F. Supp. 3d at 599-600 (granting university's motion to dismiss where off

campus rape and subsequent harassment of student was committed by non-student third party not employed by or associated with university).

### D. The response of the University Defendants was not clearly unreasonable

As this Court has recently noted, examples of unreasonable institution responses typically "involve facts where the victim complained, the defendant did little to nothing, and the harassment continued." *Qayumi v. Duke Univ.*, No. 1:16CV1038, 2018 U.S. Dist. LEXIS 64876, at *12 (M.D.N.C. April 8, 2018). *See also Jennings*, 482 F.3d at 700 (finding unreasonable university administrator's response to detailed complaint alleging harassment by coach when response entailed telling the complainant that coach was "a great guy" and that she should "work out her problems directly with him," the administrator took no action, and the harassment continued).

Here, Plaintiff places particular emphasis on the absence of any "meaningful investigation" into her allegations of sexual harassment, the lack of sympathy or understanding by Shedlick and Stone, and their purported attempts to dissuade her from pursuing the allegations. (D.E. 1, ¶¶ 42, 43) Plaintiff wholly ignores, however, that the harassment by the CRNA stopped – permanently – after she reported the incidents. Although Plaintiff claims that she received clinical assignments to WakeMed "on multiple occasions in 2017 and 2018" and performed "under the male CRNA's direct supervision," (D.E. 1, ¶ 54), the Complaint lacks a single allegation that the CRNA sexually harassed her any time after July 2016. That cessation of any harassment actually compels the conclusion that the response by the University Defendants, whatever it was, could not be "clearly unreasonable." *Davis*, 526 U.S. at 644-45 (requiring that, for deliberate indifference to

14

give rise to Title IX claim, it must "cause [plaintiff] to undergo harassment" or "make [her] liable or vulnerable" to it). Accordingly, Plaintiff cannot impute liability to the University Defendants under that theory either.

### III. PLAINTIFF'S SECOND CLAIM FOR RELIEF FAILS TO STATE A CLAIM FOR RETALIATION FOR ENGAGING IN ACTIVITY PROTECTED BY TITLE IX.

In her Second Claim for Relief, Plaintiff contends that the University Defendants retaliated against her for "reporting, opposing, and attempting to remedy a sexually hostile educational environment." (D.E. 1 at 18) To state a claim for retaliation under Title IX, a plaintiff must sufficiently allege "that they engaged in protected activity under Title IX," and "that – as a result of their protected activity – they suffered an adverse action attributable to the defendant educational institution." *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 694 (4th Cir. 2018). Assuming, *arguendo*, that the CRNA's conduct constituted sexual harassment, Plaintiff satisfies the first element by alleging she reported the conduct to Shedlick and Stone. While Plaintiff's dismissal from the DNP program would satisfy the "materially adverse action" prong of the second element, Plaintiff cannot demonstrate any causal connection between the two.

The standards applicable in Title VII jurisprudence apply to claims of retaliation under Title IX. *Stennis v. Bowie State Univ.*, 716 Fed. App'x 164, 166 (4th Cir. 2017). In Title VII cases, plaintiffs have often used temporal proximity in an effort to prove the causal link. *See, e.g.*, *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 274 (2001); *Hemphill v. United Parcel Serv.*, 975 F. Supp. 2d 548, 563 (D.S.C. 2013). However, the temporal proximity between protected activity and adverse action is rarely lengthy. *Clark*, 532 U.S.

15

at 273-74 (noting that, when relying on temporal proximity to prove causation, events must be "very close" and holding that a twenty-month period between protected activity and adverse action "suggests, by itself, no causality at all"); *Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998) ("A thirteen month interval . . . is too long to establish causation absent other evidence of retaliation"); *Hemphill*, 975 F. Supp. 2d at 563 (employment actions taken ten and eighteen months after discrimination charge filing, standing alone, fail to demonstrate causal connection via temporal proximity). Here, Plaintiff complained to Shedlick and Stone in July 2016 and in June 2018, she claims, they "orchestrated [her] . . . dismissal from the DNP program." (D.E. 1, ¶¶ 41, 56) That twenty-three month period, standing alone, falls well short of the "very close" temporal proximity required to prove a causal connection between her report and her initial dismissal.[4]

If temporal proximity alone cannot establish causation, and it does not here, then Plaintiff must allege facts to demonstrate retaliatory animus during the intervening period of time, either separate from or in conjunction with evidence of temporal proximity. *Lettieri v. Equant, Inc.*, 478 F.3d 640, 650 (4th Cir. 2007). Plaintiff's evidence again falls short of the mark. Plaintiff sweepingly alleges a "two-plus year retaliation campaign" against her "throughout 2017 and 2018" by "Dr. Shedlick, Dr. Stone and others" on a "near daily" basis. (D.E. 1, p 12 & ¶ 53) Then, in a single paragraph, Plaintiff identifies five

---

[4] Plaintiff's subsequent dismissal from the program in February 2019 (D.E. 1, ¶ 68) is seven months further removed in time from the July 2016 report and even more clearly fails to satisfy a temporal proximity test.

"examples" of this purported campaign, citing the months and years, if at all, when the retaliation most recently occurred. (D.E. 1, ¶ 54)

However, four of the five examples have no connection whatsoever to her protected activity in July 2016. Plaintiff fails to plead facts demonstrating that the fifth example – that UNCG continued "to assign [her] to perform clinical work at WakeMed Hospital (where the male CRNA referenced above worked), sometimes under the male CRNA's direct supervision" – constituted retaliation especially when the harassment by the CRNA never actually recurred. Moreover, Plaintiff prefaces these examples with a statement that UNCG, alone, and not the Board, attempted to have her removed from the DNP program through the course of conduct described. (*Id.*) At a minimum, Plaintiff fails to state a claim against the Board for any retaliation in violation of Title IX.

Plaintiff then claims that "Dr. Shedlick, Dr. Stone, and/or others orchestrated her summary dismissal in June 2018" (*Id.* at ¶ 56), and that "UNCG" did so again in February 2019 (*Id.* at ¶ 68). Once again, the allegations contain no reference to retaliatory conduct by the Board or any of its members at any time during the thirty-month period between July 2016 and Plaintiff's second dismissal in February 2019. Plaintiff claims that her counsel notified the Board in "early 2019" about the unlawful conduct she alleges in her Complaint (*Id.* at ¶ 74). The Board's refusal to intercede in or reverse the outcome of Plaintiff's ongoing appeal process hardly constitutes evidence of retaliatory animus stemming from an event thirty months prior, especially in the absence of any allegation that the Board even knew of Plaintiff's July 2016 report. The absence of any allegations of retaliatory conduct by the Board is fatal to her claim against it.

17

With respect to UNCG, the conduct alleged exhibits no pattern of antagonism or other retaliatory animus based on Plaintiff's July 2016 report to Shedlick and Stone, especially where that same retaliatory behavior also serves as the basis for Plaintiff's disability discrimination claims. (*Id.* at ¶ 53) (referencing Plaintiff's engagement in protected activity "under the ADA, Title IX, and other laws") Accordingly, as to the University Defendants, Plaintiff's Second Claim for Relief, for retaliation under Title IX, must fail.

## IV. PLAINTIFF'S SIXTH AND SEVENTH CLAIMS FOR RELIEF FAIL TO STATE A CLAIM AGAINST THE UNIVERSITY DEFENDANTS FOR VIOLATIONS OF THE ADA AND THE REHABILITATION ACT.

### A. Plaintiff's ADA Claim

In order to evaluate the sufficiency of Plaintiff's Sixth Claim for Relief under the ADA, one must examine the precise allegations in the Complaint. There, Plaintiff alleges that she suffers from ADHD (D.E. 1, ¶ 47), sought reasonable accommodations from UNCG (*Id.* at ¶ 48), endured intentional steps by individuals to frustrate those accommodations (*Id.* at ¶ 49), and, following threats of retaliation if she complained (*Id.* at ¶ 50), lodged a complaint about "the University's disability discrimination and retaliation" (*Id.* at ¶ 51). Over the ensuing twenty-six paragraphs, Plaintiff recounts what she describes as a "two-plus year retaliation campaign" against her. (*Id.* at ¶¶ 53-78). Nevertheless, in her Sixth Claim for Relief, Plaintiff never mentions the word "retaliation," but instead refers repeatedly to "discrimination" by the University Defendants in at least five different ways. (*Id.* at ¶¶ 132-36) Although the University Defendants believe that Plaintiff has

18

only alleged a discrimination claim under the ADA and not one for retaliation, they address below the legal standards applicable to each.

### 1. Discrimination

In the context of public higher education, Title II of the ADA requires an institution "to make 'reasonable modifications to rules, policies, or practices . . .' to enable disabled persons to receive services or participate in programs or activities." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 488 (4th Cir. 2005) (quoting 42 U.S.C. § 12131(2)). This obligation includes making "reasonable accommodations for disabled students to ensure that they are able to participate in the educational program." *Id.* To establish a prima facie case under the ADA, a plaintiff must show that: (1) she has a disability; (2) she was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities for which she was otherwise qualified; and (3) the exclusion, denial of benefits, or discrimination was by reason of her disability. *Constantine*, 411 F.3d at 498. Plaintiff cannot satisfy the second or third element of a discrimination claim.

Plaintiff claims that she requested and received from UNCG test-taking accommodations for her ADHD, but that "Dr. Stone and Dr. Shedlick (among others)" interfered with those accommodations, mocked her disability in front of other students, and threatened to have her removed from the DNP program if she complained. (D.E. 1, ¶¶ 48-50) However, Plaintiff fails to allege that she was excluded from the DNP program or was even prevented from advancing within it – either as a result of failed examinations, poor academic performance, or some other reason – because she has ADHD or because certain

individuals frustrated the approved accommodations. Plaintiff also fails to allege which comparator DNP program student(s) with ADHD were treated differently than she was and what reasonable accommodations the University Defendants gave to other students with ADHD that they denied Plaintiff. Her conclusory allegations (*Id.* at ¶¶ 132-33), asserted without any factual support, fail to satisfy the pleading requirements imposed by *Iqbal, Twombly* and *Nemet.*

The same deficiencies derail any ADA discrimination claim predicated on the theory that the University Defendants discriminated against her by not resolving the "harassment and discrimination she endured at her clinical rotations." (*Id.* at ¶ 134) Notably, Plaintiff's entire complaint identifies a single clinical rotation at which she endured anything approximating harassment or discrimination. (*Id.* at ¶ 38) The Complaint contains no allegations that the harassment ever recurred after July 2016. As a result, this Court can draw no credible inference that any official or employee of the University Defendants refused to intervene and "correct" a non-recurrent incident of harassment, let alone refused to do so because Plaintiff suffers from ADHD. Plaintiff also provides no facts to support her contentions that, *because she suffers from ADHD*, the University Defendants dismissed her from the DNP program and subsequently refused to reinstate her. (*Id.* at ¶¶ 135-36) As a result, Plaintiff cannot sustain a claim for disability discrimination under the ADA.

### 2. Retaliation

To state a retaliation claim under the ADA, a plaintiff must present evidence that: (1) she "engaged in conduct protected by the ADA;" (2) she "suffered an adverse action

subsequent to engaging in the protected conduct;" and (3) "there was a causal link between the protected activity and the adverse action." *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 216 (4th Cir. 2002). Plaintiff's Complaint contains at least three glaring factual deficiencies. First, Plaintiff fails to identify the month and/or year when she reported to OARS that individuals were interfering with her approved accommodations. (D.E. 1, ¶ 51) Second, even assuming, *arguendo*, that her report to OARS constituted protected activity under the ADA, Plaintiff alleges no facts explaining which UNCG officials were aware of that report, when she believes they became aware, and how, if at all, the conduct of those unnamed officials changed following the report, making it impossible to determine the precise adverse action about which she complains. Third, Plaintiff identifies no specific facts distinguishing what conduct within the "two-plus year retaliation campaign" allegedly waged against her was motivated by disability-related animus as opposed to gender-based bias in violation of Title IX or mere personal animosity held by university officials or employees towards her. Plaintiff thus provides no plausible claim, supported by demonstrable facts, that her report to OARS caused her dismissal from the DNP program.

Even if one assumes Plaintiff contacted OARS immediately prior to her initial dismissal in June 2018, her reinstatement in October 2018 dispels any notion that the University Defendants were waging a concerted (or at least effective) campaign of disability-based retaliation against her. If Plaintiff contends that her February 2019 dismissal constitutes the adverse action, that step was taken more than seven months after June 2018, assuming that date as the latest by which Plaintiff filed the OARS complaint.

That time frame exceeds the "very close" temporal proximity required to warrant an inference of causation. *See, e.g.*, *Causey*, 162 F.3d at 803 (holding that thirteen month interval between protected activity and termination is too long to establish causation absent other evidence and approvingly citing Tenth Circuit case holding that a four-month gap is too long to support causation) (citing *Conner v. Schnuck Mkts., Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997)); *Ullrich v. CEXEC, Inc.*, 233 F. Supp. 3d 515, 532-33 (E.D. Va. 2017) (holding that six-month and sixteen-month gaps were insufficient by themselves to establish an inference of causation). Accordingly, Plaintiff cannot sustain a claim for retaliation under the ADA.

### B. **Plaintiff's Rehabilitation Act Claim**

Claims under Title II of the ADA and under the Rehabilitation Act are construed to be "substantially the same" for analytical purposes. *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1265 n. 9 (4th Cir. 2005).[5] Under the same standards discussed above with respect to her ADA claims, the University Defendants are entitled to dismissal of Plaintiff's claims of discrimination and retaliation under the Rehabilitation Act.

Aside from the unique allegation that the University Defendants, by dismissing her, retaliated against her for complaining about disability discrimination (D.E. 1, ¶¶ 145, 147), Plaintiff's remaining contentions that the University Defendants discriminated against her mirror those discussed above with respect to her ADA claim. For the same reasons as

---

[5] The third and fourth elements of a claim for a violation of § 504 of the Rehabilitation Act are different, however, as a plaintiff must allege that "(3) she was excluded from participation in, was denied the benefits of, or was subjected to discrimination *solely by reason of* her disability; and (4) the institution receives federal financial assistance." *Betts v. Rector & Visitors of the Univ. of Va.*, 145 F. App'x 7, 10 (4th Cir. 2005) (emphasis added); *Doe*, 50 F.3d at 1265.

discussed above, those allegations fail to state a claim that Plaintiff was discriminated against "solely by reason of her disability." In addition, the same temporal proximity problems that prevent the drawing of the inference of causation for her ADA claim also doom Plaintiff's claim for retaliation under the Rehabilitation Act. Accordingly, Plaintiff's claims under the Rehabilitation Act should similarly be dismissed.

## CONCLUSION

For the foregoing reasons, the University Defendants respectfully request that Plaintiff's claims against them be dismissed in accordance with Rule 12(b)(1) and 12(b)(6).

The University Defendants further respectfully move this Court to stay all discovery in this matter pending resolution of their motion to dismiss. In addition to the interests of judicial economy which would be served by such a stay, the immunity from suit under the Eleventh Amendment, at least with respect to some of Plaintiff's claims, would otherwise be negated if discovery were permitted to commence.

Respectfully submitted, this the 23rd day of September, 2019.

JOSHUA H. STEIN
Attorney General

/s/Joseph Finarelli
Joseph Finarelli
Special Deputy Attorney General
N.C. State Bar No. 26712
N.C. Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602-0629
Telephone: (919) 716-6531
Fax: (919) 716-6761
E-mail: jfinarelli@ncdoj.gov

## <u>CERTIFICATE OF WORD COUNT</u>

Pursuant to Local Rule 7.3(d)(1), the undersigned certifies that this brief contains no more than 6,250 words, as calculated by the word count feature of Microsoft Word 2013.

This the 23rd day of September, 2019.

<u>/s/ Joseph Finarelli</u>
Joseph Finarelli
Special Deputy Attorney General

Case 1:19-cv-00661-WO-JLW   Document 9   Filed 09/23/19   Page 24 of 25

## CERTIFICATE OF SERVICE

I hereby certify that I have, on this day, electronically filed the foregoing **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all registered CM/ECF users, including Plaintiff's counsel, at the following address:

> Nicholas J. Sanservino, Jr.,
> The Noble Law Firm, PLLC
> nsanservino@thenoblelaw.com

This the 23rd day of September, 2019.

/s/ Joseph Finarelli
Joseph Finarelli
Special Deputy Attorney General