IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

AUTUMN DAVIS,                        )
                                     )
            Plaintiff,               )
                                     )
      v.                             )        1:19CV661
                                     )
UNIVERSITY OF NORTH CAROLINA         )
AT GREENSBORO, THE BOARD OF          )
GOVERNORS OF THE UNIVERSITY OF       )
NORTH CAROLINA, and RALEIGH          )
SCHOOL OF NURSE ANESTHESIA,          )
                                     )
            Defendants.              )

## MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

Plaintiff Autumn Davis brings eight claims against
Defendants University of North Carolina at Greensboro ("UNCG" or
"the University"), the Board of Governors of the University of
North Carolina (the "Board"), and Raleigh School of Nurse
Anesthesia ("RSNA"). Defendants UNCG and the Board (collectively
"Defendants") have moved to dismiss Plaintiff's claims under
Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), (Doc.
8), Plaintiff responded, (Doc. 10), and Defendants have filed a
reply, (Doc. 11). This case is ripe for adjudication. For the
reasons set forth herein, the court will grant Defendants'
motion in part and deny Defendants' motion in part.

# I. __FACTUAL BACKGROUND AND PROCEDURAL HISTORY__

On a motion to dismiss, a court must "accept as true all of the factual allegations contained in the complaint . . . ." Ray v. Roane, 948 F.3d 222, 226 (4th Cir. 2020). The facts, taken in the light most favorable to Plaintiff, are as follows.

## A. __Parties__

Plaintiff Autumn Davis ("Plaintiff" or "Ms. Davis") is a resident of North Carolina. (Complaint ("Compl.") (Doc. 1) ¶ 9.) Defendant UNCG is a "component" of the University of North Carolina ("UNC") System. (Id. ¶ 1.) It is a state institution located in Greensboro, North Carolina, established pursuant to the laws of North Carolina. (Id.) Defendant UNCG receives federal financial assistance for the purposes of Section 504 of the Rehabilitation Act and is a public entity for the purposes of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132 (Id. ¶ 2.)

The Board is "the policy-making body legally charged with the general determination, control, supervision, management and governance of all affairs of the constituent institutions," and has supervisory authority over the UNC system's member-institutions. (Id. ¶¶ 4-5.)

- 2 -

Defendant RSNA is a nonprofit corporation organized under the laws of North Carolina. (Id. ¶ 6.) Defendant RSNA is allegedly a "joint/single entity with UNCG."[1] (Id. ¶ 7.)

The following individuals are not defendants but are relevant actors for Plaintiff's Complaint. Dr. Robin Remsburg is the Dean of UNCG's School of Nursing. (Id. ¶ 18.) Dr. Kelly Burke is the Dean of UNCG's Graduate School. (Id. ¶ 19.) Dr. Franklin Gilliam, Jr., is UNCG's Chancellor. (Id. ¶ 20.) Jerry D. Blakemore is UNCG's General Counsel. (Id. ¶ 22.) Harry Smith, Jr., is the Chair of the UNC Board. (Id. ¶ 23.) Thomas C. Shanahan is the Senior Vice-President and General Counsel for the UNC Board. (Id. ¶ 24.)

B.    **Factual Background**

1.    **Plaintiff's Participation in the DNP Program**

Plaintiff enrolled in UNCG's Doctor of Nursing Practice ("DNP") program in August 2015, in order to obtain a Master of Science in Nursing degree, with a concentration in nurse anesthesia. (Id. ¶ 15.) Plaintiff sought to become a Certified Registered Nurse Anesthetist ("CRNA"). (Id. ¶ 14.) Plaintiff also enrolled as required at RSNA, a nonprofit associated with the DNP program. (Id. ¶ 15.)

---

[1] Defendant RSNA has not moved to dismiss Plaintiff's Complaint.

"The DNP program requires, among other things, the completion of academic courses and practicum courses, which are to be completed in a supervised clinical setting through RSNA." (Id. ¶ 16.) UNCG and RSNA assigned Plaintiff to perform clinical work at local North Carolina hospitals, such as Rex Hospital and WakeMed Hospital, as a student nursing anesthetist. (Id. ¶ 17.) A CRNA employed by the attending hospital supervised Plaintiff while performing her clinical work. (Id.)

### 2. <u>Plaintiff's Sexual Harassment Complaints</u>

UNCG assigned Plaintiff to work as a Student Registered Nursing Anesthetist at WakeMed Raleigh Hospital ("WakeMed") in July 2016. (Id. ¶ 37.) A particular male CRNA ("male CRNA") acted as her direct supervisor during much of her time at WakeMed. Plaintiff alleges that this male CRNA repeatedly "made sexually suggestive and otherwise inappropriate jokes to Ms. Davis." (Id. ¶ 38.) For instance, "on one occasion where a female patient was under anesthesia, the male CRNA stated in front of Ms. Davis, 'man, the surgeon can take as long as he wants in this case, it's a nice view. When I saw her tits, I mean man.'" (Id.) This male CRNA also repeatedly asked Plaintiff to strip for him. (Id. ¶ 38.) He also "asked Ms. Davis out on dates, even after she asked him to stop," and "pushed his erect penis against Ms. Davis' body while she was working." (Id.)

- 4 -

Plaintiff was "mortified by the particular male CRNA's conduct and suffered substantial distress as a result, to the point of being diagnosed with anxiety and depression." (Id. ¶ 40.)

### 3. **Plaintiff's Reports**

Plaintiff reported this conduct to Dr. Nancy Shedlick ("Dr. Shedlick") and Dr. Linda Stone ("Dr. Stone") in July 2016. (Id. ¶ 41.) Dr. Shedlick was the Program Administrator "in charge of UNCG's DNP program." (Id. ¶ 35.) Dr. Stone served as the RSNA Assistant Program Administrator for the DNP program and reported directly to Dr. Shedlick. (Id. ¶ 36.) Upon receiving Plaintiff's first complaint, Dr. Stone "pointedly asked Ms. Davis, 'are you sure you want to make this type of complaint?' in an attempt to intimidate Ms. Davis and otherwise cause her to withdraw her complaint." (Id. ¶ 42.) Moreover, "Dr. Shedlick and Dr. Stone intentionally downplayed the particular male CRNA's conduct and tried to claim it somehow was 'accidental.'" (Id.) Both Dr. Shedlick and Dr. Stone then "pressured Ms. Davis not to share her complaint with anyone else." (Id.) Plaintiff did not withdraw her complaint. (Id. ¶ 43.) Despite Plaintiff's allegations, no meaningful investigation of her complaint ever occurred. (Id.)

Around the end of October 2016, Defendants assigned Plaintiff to work with the same male CRNA again. (Id. ¶ 44.) Plaintiff complained to the Chief CRNA at WakeMed and "asked why she was assigned to the male CRNA notwithstanding his past conduct towards her." (Id.) The Chief CRNA told Plaintiff that neither she nor the hospital had been advised about Plaintiff's sexual harassment complaint, nor had she been told that the hospital should restrict interactions between Plaintiff and the male CRNA. (Id.) The Chief CRNA directed Plaintiff to "speak again with Dr. Shedlick and Dr. Stone and obtain their authorization for restrictions on her contacts with the male CRNA." (Id.) Plaintiff followed this directive and emailed Dr. Stone on November 1, 2016, in which Plaintiff stated that "[e]very encounter with [the male CRNA] has escalated, and the last encounter left me feeling sexually exploited for weeks." (Id. ¶ 45 (alterations in original).) Dr. Stone and Dr. Shedlick responded by "reprimand[ing] Ms. Davis for going 'outside the chain of command' by bringing this issue to [the Chief CRNA]'s attention." (Id. ¶ 46.) Dr. Stone then stated that, despite Plaintiff's previous complaints of harassment, Plaintiff "needed to understand" that she "'may work with [the male CRNA] when assigned to Wake as he works the call schedule'" and she "'may be assigned with him on off-shifts.'" (Id.)

- 6 -

### 4. **UNCG's Alleged History with Sexual Harassment**

Plaintiff also alleges that, prior to July 2016, "multiple female students in the DNP program lodged sexual harassment and/or related complaints while training as Registered Nurses at local North Carolina hospitals," that "some or all of these complaints were made against the same male CRNA, who on information and belief continues to remain employed within the UNC Healthcare System," and that "each of the named Defendants were aware and/or should have been aware of the pre-July 2016 complaints." (Id. ¶ 26.) Further, Plaintiff alleges, "UNCG (including but not limited to its Human Resources Department, its Legal Department and its General Counsel Jerry Blakemore), the UNC Board (including but not limited to its General Counsel Thomas Shanahan) and RSNA were and have been aware of the unlawful sexual harassment and retaliation" and "have refused to take appropriate steps to investigate and remedy the unlawful conduct." (Id. ¶ 29.)

### 5. **Plaintiff's Disability**

Plaintiff suffers from attention deficit/hyperactivity disorder ("ADHD"). (Id. ¶ 47.) Plaintiff "requested reasonable accommodations from UNCG, including extended time for completing exams and placement in a quiet environment when taking exams to limit interruptions." (Id. ¶ 48.) Though UNCG "granted" these

- 7 -

requests, Plaintiff alleges it "intentionally took steps to ensure the accommodations were not implemented properly." (Id. ¶ 49.) She alleges that "Dr. Stone and Dr. Shedlick (among others) repeatedly interrupted Ms. Davis during testing and otherwise ensured that she did not take exams in a quiet working environment." (Id.) Dr. Stone and Dr. Shedlick also frequently mocked Plaintiff's disability in front of other students and yelled at Plaintiff prior to exams over her requested accommodations. (Id. ¶ 50.) Further, Plaintiff alleges "Dr. Stone and Dr. Shedlick . . . threatened to have Ms. Davis dismissed from the DNP program if she complained about any of their conduct towards her." (Id.)

Despite these threats, Plaintiff complained to UNCG's Office of Accessibility and Resource Services about what she perceived to be disability-based discrimination and retaliation. (Id. ¶ 51.) Plaintiff alleges that, in response, throughout 2017 and 2018 "UNCG (through Dr. Shedlick, Dr. Stone and others) engaged in a near daily campaign to inflict maximum harm upon Ms. Davis, a student who had engaged in protected conduct under the ADA, Title IX and other laws." (Id. ¶ 53.) For example, Plaintiff contends that UNCG retaliated against her by continuing to assign her to work at WakeMed, sometimes under the male CRNA's supervision; having Dr. Shedlick and Dr. Stone claim

- 8 -

Plaintiff was not "fit for duty" for the DNP program, which occurred as recently as June 2018; fabricating documents to make it appear as though Plaintiff was not completing her clinical work correctly, which occurred as recently as January 2019; having Dr. Stone and Dr. Shedlick falsely accuse Plaintiff of insubordination in June 2018; and having Dr. Stone and Dr. Shedlick "repeatedly advise students that they were doing everything they could to have Ms. Davis dismissed from the DNP program." (Id. 54.) Indeed, Plaintiff alleges that, "on multiple occasions during 2017 and 2018, Dr. Shedlick and/or Dr. Stone made comments to Ms. Davis like, 'if I can't get rid of you for this [latest fabricated reason], I can get rid of you for something else.'" (Id. ¶ 55.)

### 6. Plaintiff's Dismissal

In June 2018, approximately one month before Plaintiff was to complete the DNP program and receive her degree, Plaintiff alleges that Dr. Stone, Dr. Shedlick, among others, "orchestrated" her dismissal from the program for "false reasons." (Id. ¶ 56.) The stated reason for Plaintiff's dismissal was "unsafe nursing practices." (Id. ¶ 56.)

Plaintiff had accepted a post-graduate job starting in November 2018, which was contingent on Plaintiff obtaining her Doctor of Nursing Anesthesia Practice degree. (Id. ¶ 57.)

- 9 -

Plaintiff alleges that Dr. Shedlick, Dr. Stone, and others "knew or should have known" that Plaintiff had accepted this position. (Id.) UNCG scheduled appeal hearings in August and October 2018. (Id. ¶ 58.)

### C.    Procedural History

Plaintiff filed her Complaint in this court in July 2019. (Compl. (Doc. 1).) Defendants UNCG and the Board moved to dismiss Plaintiff's Complaint, (Doc. 8), along with a supporting brief. (Defs. Mem. of Law in Supp. of Mot. to Dismiss ("Defs.' Br.") (Doc. 9).) Plaintiff responded, (Pl.'s Resp. in Opp'n to Defs.' Mot. to Dismiss ("Pl.'s Resp.") (Doc. 10)), and Defendants replied, ("Defs.' Reply") (Doc. 11)). Summons was issued for Defendant Raleigh School of Nurse Anesthesia, (Doc. 2-2), was served via certified mail, (Doc. 7), and has not appeared in this case.

## II.  STANDARDS OF REVIEW

### A.    Rule 12(b)(6)

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible on its face if "the plaintiff pleads factual content that allows the

- 10 -

court to draw the reasonable inference that the defendant is liable" and demonstrates "more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556–57). When ruling on a motion to dismiss, this court accepts the complaint's factual allegations as true. Id. Further, this court liberally construes "the complaint, including all reasonable inferences therefrom, . . . in plaintiff's favor." Estate of Williams-Moore v. All. One Receivables Mgmt., Inc., 335 F. Supp. 2d 636, 646 (M.D.N.C. 2004) (citation omitted). This court does not, however, accept legal conclusions as true, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.

### B.   Rule 12(b)(1)

Under Federal Rule of Civil Procedure 12(b)(1), a plaintiff must prove by a preponderance of the evidence the existence of subject-matter jurisdiction. See Demetres v. East West Constr., Inc., 776 F.3d 271, 272 (4th Cir. 2015). A defendant may challenge subject-matter jurisdiction facially or factually. See Kerns v. United States, 585 F.3d 187, 192 (4th Cir. 2009). In a facial challenge, a defendant asserts that the allegations, taken as true, are insufficient to establish subject-matter jurisdiction. See id. The court then effectively affords a

plaintiff "'the same procedural protection as he would receive under a Rule 12(b)(6) consideration," taking the facts as true and denying the Rule 12(b)(1) motion if the complaint "alleges sufficient facts to invoke subject matter jurisdiction." Id. (quoting Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982)).

In a factual challenge, a defendant asserts that the jurisdictional allegations are false, and the court may look beyond the complaint to resolve the disputed jurisdictional facts without converting the motion to one for summary judgment. Id. at 192–93. However, where the Eleventh Amendment bar has been asserted by a party, that party has the burden of proving that it is entitled to immunity. Hutto v. S.C. Ret. Sys., 773 F.3d 536, 543 (4th Cir. 2014).

## III. **ANALYSIS**

Because Eleventh Amendment immunity is dispositive as to four of Plaintiff's claims, the court addresses this issue first.

### A. **The Eleventh Amendment**

Defendants argue that Plaintiff's 42 U.S.C. § 1983 claims, as well as Plaintiff's state law claims, should be dismissed as barred by the Eleventh Amendment under Rule 12(b)(1). (Defs.' Br. (Doc. 9) at 6.)

Here, Defendants argue that the Eleventh Amendment bars Plaintiff's § 1983 claims and state law claims, which Plaintiff concedes with regard to the § 1983 claims and the North Carolina Constitutional claim insofar as she requests damages, but asks the court to dismiss these claims without prejudice so that she may amend her Complaint.[2] (See Pl.'s Resp. (Doc. 10) at 22 n.7.) Plaintiff does not concede that the Eleventh Amendment bars her unjust enrichment claim. Plaintiff's one-sentence request for permission to amend the Complaint is not in the form necessary

_____

[2] The court also finds the following finding of the Fourth Circuit applicable here:

> An alternative and potentially dispositive basis for denial of the § 1983 claims against NCSU, the NCSU governing board, the Board of Governors of the University of North Carolina, and the individual defendants in their official capacities is that, as alter egos of the state, they are not "persons" within the meaning of § 1983. Because this ground was not advanced or argued by the parties, the Court does not here rely on it.

Huang v. Bd. of Governors of Univ. of N.C., 902 F.2d 1134, n.6 (4th Cir. 1990) (citing Will v. Michigan Dept. of State Police, 491 U.S. 58 (1989)).

Further, while Plaintiff requests injunctive relief, the court notes that the Ex Parte Young, 209 U.S. 123 (1908), exception to the Eleventh Amendment does not apply here because that exception only applies to "state officials," and Defendants are not "state officials." See Franks v. Ross, 313 F.3d 184, 197 (4th Cir. 2002).

- 13 -

to move to amend.[3] See L.R. 15.1 ("[T]he moving party shall attach the proposed amended pleading to the motion.").

Defendants are entitled to Eleventh Amendment immunity. See Emanuelson v. Univ. of N.C. at Greensboro, No. 1:17CV534, 2018 WL 1779342, at *4 (M.D.N.C. Apr. 12, 2018) ("UNCG is a constituent institution of the University of North Carolina and, as such, UNCG, like the University of North Carolina, is an agency of the State of North Carolina entitled to Eleventh Amendment immunity."); see also Huang v. Bd. of Governors of Univ. of N.C., 902 F.2d 1134, 1139 n.6 (4th Cir. 1990) (finding that the Eleventh Amendment barred a suit for damages against UNC); McCants v. NCAA, 251 F. Supp. 3d 952, 959 (M.D.N.C. 2017) (noting that UNC has Eleventh Amendment immunity); McAdoo v. Univ. of N.C. at Chapel Hill, 248 F. Supp. 3d 705, 718-19 (M.D.N.C. 2017) (concluding that UNC is an arm of the state).

The court will therefore examine whether Plaintiff's unjust enrichment claim is barred by the Eleventh Amendment.

A plaintiff can overcome Eleventh Amendment immunity in three ways. First, Congress may abrogate Eleventh Amendment immunity through statute "if it makes its intention to abrogate

_____

[3] Nevertheless, because the court will dismiss this claim under Rule 12(b)(1), the dismissal is without prejudice and Plaintiff is free to seek leave to amend her Complaint.

- 14 -

unmistakably clear in the language of the statute and acts pursuant to a valid exercise of [constitutional authority]." Nev. Dep't of Human Res. v. Hibbs, 538 U.S. 721, 726 (2003). Second, a plaintiff can overcome the Eleventh Amendment bar if the State clearly and unambiguously waives sovereign immunity. Pense v. Md. Dep't of Pub. Safety & Corr. Servs., 926 F.3d 97, 101 (4th Cir. 2019). Finally, a plaintiff can prevail if Ex Parte Young, 209 U.S. 123 (1908) applies, which strips immunity when a suit seeking prospective relief is brought against state officials in their official capacities, so long as the violation is ongoing. Republic of Paraguay v. Allen, 134 F.3d 622, 627 (4th Cir. 1998). Absent one of these excepted scenarios, Plaintiff cannot overcome Eleventh Amendment immunity to assert unjust enrichment against Defendants.

None of the three ways to overcome Eleventh Amendment immunity apply to Plaintiff's unjust enrichment claim. First, there is no federal statute here which would abrogate the state's Eleventh Amendment immunity; as unjust enrichment is a state law claim.

Second, Plaintiff has failed to allege that the State has waived sovereign immunity. "The doctrine of sovereign immunity bars actions against public officials sued in their official capacities." Phillips v. Gray, 163 N.C. App. 52, 56–57, 592

- 15 -

S.E.2d 229, 232 (2004) (citation omitted). Sovereign immunity is

"absolute unless the [covered entity] has consented to [suit] or

otherwise waived its right to immunity."[4] <u>Fullwood v. Barnes</u>, 250

N.C. App. 31, 37, 792 S.E.2d 545, 550 (2016) (quoting

<u>Schlossberg v. Goins</u>, 141 N.C. App. 436, 440, 540 S.E.2d 49, 52

(2000)). As legal alter egos of the state, UNCG and the Board of

Governors both receive sovereign immunity. <u>See</u> <u>McAdoo</u>, 248

F. Supp. 3d at 718-19 (collecting cases concerning the UNC

system's sovereign immunity); <u>see also</u> <u>Huang</u>, 902 F.2d at 1139

n.6 (recognizing the Board of Governors of the University of

North Carolina as an alter ego of the State of North Carolina).

Generally, in order to waive sovereign immunity on a claim

of unjust enrichment, a defendant must have consented to some

implied or explicit contract. <u>See</u> <u>M Series Rebuild, LLC v. Town</u>

<u>of Mt. Pleasant</u>, 222 N.C. App. 59, 67-68, 730 S.E.2d 254, 259

(2012) (holding that an unjust enrichment claim cannot abrogate

sovereign immunity absent allegations of a valid contract). In

North Carolina, implied contracts are insufficient to justify an

unjust enrichment claim. The North Carolina Supreme Court has

_____

[4] One recent North Carolina Court of Appeals case, however, notes that "even as public officials acting within the scope of their official authority, sovereign immunity will not shield Individual Defendants from suit for actions they took which were malicious or corrupt." <u>McCullers v. Lewis</u>, 265 N.C. App. 216, 828 S.E.2d 524, 531 (2019).

- 16 -

held that "[o]nly when the State has implicitly waived sovereign immunity by _expressly_ entering into a _valid_ contract . . . may a plaintiff proceed with a claim against the State upon the State's breach." Whitfield v. Gilchrist, 348 N.C. 39, 43, 497 S.E.2d 412, 415 (1998). Similarly, North Carolina courts have "decline[d] 'to imply a contract in law in derogation of sovereign immunity to allow a party to recover under a theory of' unjust enrichment." M Series Rebuild, 222 N.C. App. at 67, 730 S.E.2d at 260 (quoting Data Gen. Corp. v. Cnty. of Durham, 143 N.C. App. 97, 103, 545 S.E.2d 243, 248 (2001)).

Plaintiff has failed to allege that Defendants expressly entered a valid contract in this case. In fact, at no point does Plaintiff allege Defendants entered into a contract at all. The court finds that the State has not waived sovereign immunity with respect to Plaintiff's unjust enrichment claim.

Finally, the aforementioned third Eleventh Amendment exception also does not apply, as Plaintiff has not sued any individuals.

Since no exceptions to Eleventh Amendment immunity apply, the Eleventh Amendment bars Plaintiff's unjust enrichment claim. Plaintiff concedes that the Eleventh Amendment bars her § 1983 claims and her North Carolina Constitutional claim. The court

will therefore grant Defendants' motion to dismiss Plaintiff's Third, Fourth, Fifth, and Eighth claims under Rule 12(b)(1).

### B.    **Title IX Sex Discrimination**

Defendants move to dismiss Plaintiff's Title IX claims under Rule 12(b)(6). (Defs.' Br. (Doc. 9) at 9–16.) Title IX states that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX contains an implied private right of action permitting aggrieved parties to sue educational institutions for alleged violations. Cannon v. Univ. of Chi., 441 U.S. 677, 713 (1979).

### 1.    **Claim One: Sex Discrimination & Sexually Hostile Educational Environment**

Title IX liability can extend to the educational institution when teachers or other students harass a victim student due to the victim's sex. See Davis v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 646–47 (1999) (finding that a school can be liable for "known acts of student-on-student sexual harassment [when] the harasser is under the school's disciplinary authority"); Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 278 (1998) (stating that a teacher had a sexual relationship with a teenage student).

A Title IX sexual harassment plaintiff must plausibly allege that:

> (1) she was a student at an educational institution receiving federal funds, (2) she was subjected to harassment based on her sex, (3) the harassment was sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity, and (4) there is a basis for imputing liability to the institution.

Jennings v. Univ. of N.C., 482 F.3d 686, 695 (4th Cir. 2007); see also Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 66 (1st Cir. 2002).

Plaintiff clearly alleges the first element: she was a student at a school which receives federal funds, UNCG. (Compl. (Doc. 1) ¶¶ 2, 15.) The three remaining elements are at issue.

### a.   Harassment Based on Sex

The second element of a Title IX sexual harassment claim asks whether Plaintiff was subjected to harassment based on her sex. Courts consider this prong satisfied when the harassment at issue clearly stems from sexual desire. See, e.g., Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998) (finding that when "challenged conduct . . . involves explicit or implicit proposals of sexual activity; it is reasonable to assume those proposals would not have been made to someone of the same sex"). Plaintiff has pled facts which plausibly allege this element.

- 19 -

**b.** **Harassment was Severe, Pervasive, and Created Hostile Environment**

Next, Plaintiff must allege that the sex-based harassment was "so severe, pervasive, and objectively offensive that it can be said to deprive the victim[] of access to the educational opportunities or benefits provided by the school." Davis, 526 U.S. at 650.

The Fourth Circuit has defined the deprivation of access to educational opportunities as any "concrete, negative effect on [the victim's] ability to participate in an educational program or activity." Jennings, 482 F.3d at 699 (alteration in original) (internal quotation marks omitted). Whether sexual harassment is sufficient to create this concrete, negative effect "depends on a constellation of surrounding circumstances, expectations, and relationships." Id. at 696 (internal quotation marks omitted). Courts analyze the frequency and severity of the harassment to determine whether such a negative effect exists. See Doe v. Bd. of Educ. of Prince George's Cnty., 982 F. Supp. 2d 641, 652 (D. Md. 2013), aff'd, 605 F. App'x 159 (4th Cir. 2015).

Here, Plaintiff alleges that the harassment occurred "repeatedly" and "[t]hroughout" her time at WakeMed. (Compl. (Doc. 1) ¶ 38.) Moreover, courts have found harassment particularly severe where it involves physical contact, Davis, 526 U.S. at 653; or where it causes the victim serious

- 20 -

discomfort or anxiety.[5] <u>Jennings</u>, 482 F.3d at 699. Both of these factors are present here. Plaintiff alleges consistent harassment with at least one instance of physical touching: namely, the male CRNA "push[ed] his erect penis against [Plaintiff's] body while she was working." (Pl.'s Resp. (Doc. 10) at 3.) Moreover, Plaintiff alleges that she "suffered substantial distress as a result, to the point of being diagnosed with anxiety and depression." (<u>Id.</u>) Contrary to Defendants' argument, (Defs.' Br. (Doc. 9) at 13), a decline in academic performance is not necessary to demonstrate that Plaintiff was deprived of educational opportunities. <u>See Jennings</u>, 526 F.3d at 699-700. Plaintiff has plausibly alleged that the harassment was frequent and severe enough to demonstrate a negative effect on her ability to participate in her educational program.

### c. <u>Liability may be Imputed to Defendants</u>

Plaintiff does not allege that her harasser was formally affiliated with Defendants. When a federal funding recipient does not engage in harassment directly, the court can only

---

[5] Other factors that may indicate severe conduct include the presence of multiple victims or a downward trend in the victim's academic performance. <u>See Doe</u>, 982 F. Supp. 2d at 652. Courts also consider the ages of both the victim and the harasser in analyzing severity. <u>Id.</u>

impute liability to an institution if it is "deliberately indifferent to sexual harassment, of which [it has] actual knowledge," Davis, 526 U.S. at 650, and its "deliberate indifference ... cause[s] [the victim] to undergo harassment or make[s] [her] liable or vulnerable to it." Id. at 644-45 (internal quotation marks omitted). Three prongs are required: actual knowledge, deliberate indifference, and Plaintiff's resulting vulnerability to future harassment. Plaintiff alleges sufficient facts to plausibly establish that Defendants had actual knowledge of the harassment, were deliberately indifferent to it, and made her vulnerable to continued harassment by the male CRNA.

First, Plaintiff plausibly alleges actual knowledge by Defendants. Plaintiff first complained about "sexual harassment and physical assault" to two officials, one of whom was her UNCG-employed supervisor, in July 2016 – her first month at WakeMed. (Compl. (Doc. 1) ¶ 41.)[6] She later complained a second

_____

[6] Plaintiff also alleges that Defendants had extensive knowledge of previous complaints by other victims of sexual harassment. (Compl. (Doc. 1) ¶¶ 26-28.) However, Plaintiff fails to provide any details about these alleged complaints, including the identities of the victims, dates of the reports, content of the allegations, or information about who received the complaints. Though this court considers Plaintiff's allegations regarding past victims conclusory at this stage, Plaintiff provides enough information about her own experience to

(Footnote continued)

time to that same UNCG supervisor, Dr. Shedlick, who served as the Program Administrator in charge of Plaintiff's three-year DNP program. (Id. ¶ 35.) These two instances sufficiently establish actual knowledge on the part of UNCG. See Jennings, 482 F.3d at 700 (finding that where victim met with "an official responsible for fielding sexual harassment complaints" to describe harassment, sufficient evidence existed for a jury to decide whether the victim "gave [the official], and by extension UNC, actual notice" of harassment) (emphasis added).

Plaintiff also alleges deliberate indifference by Defendants. An institution will be deemed deliberately indifferent to harassment "only where [its] response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." Rouse v. Duke Univ., 914 F. Supp. 2d 717, 723–24 (M.D.N.C. 2012), aff'd, 535 F. App'x 289 (4th Cir. 2013) (quoting Davis, 526 U.S. at 648). After Plaintiff's July 2016 complaint, no action was taken. (Compl. (Doc. 1) ¶ 43.) Moreover, the Chief CRNA at WakeMed made clear that no one from UNCG so much as attempted to keep Plaintiff separate from her harasser, in spite of Defendants' ability to do so. (Id. ¶ 44.)

---

establish the elements of a sexual harassment claim without relying on prior victims at this stage in the pleadings. Though more information may arise at a later stage, this court will not incorporate these conclusory allegations into its present analysis.

Thus, Plaintiff was forced to continue working "under the male CRNA's direct supervision" even after both of her complaints to UNCG. (Id. ¶ 54.) The Fourth Circuit has found far more robust responses than this one plausibly inadequate. See Feminist Majority Found. v. Hurley, 911 F.3d 674, 689 (4th Cir. 2018) (finding that a university's response to harassment complaints was plausibly unreasonable even when the university held "listening circles," sent an email about the issue, and gave a threatened student a campus police guard for one evening"); Jennings, 482 F.3d at 701 (finding that a "[u]niversity's failure to take any action to remedy the [harassment] would allow a rational jury to find deliberate indifference to ongoing discrimination").

Moreover, Defendants controlled Plaintiff's educational environment. Deliberate indifference may only be alleged where the university "exercises substantial control over both the harasser and the context in which the known harassment occurs." Davis, 526 U.S. at 645. Defendants argue that Plaintiff fails to allege UNCG could "exercise control over CRNA/student supervision assignments" or "in any way influence" the clinical experience. (Defs.' Br. (Doc. 9) at 13.) However, Plaintiff clearly alleges that the Chief CRNA at WakeMed told her UNCG officials could "obtain . . . restrictions on [Plaintiff's]

- 24 -

contacts with the male CRNA"." (Compl. (Doc. 1) ¶ 44.) Nor did WakeMed get the final say over student supervision: in fact, the WakeMed employee advised Plaintiff to talk with her administrators from UNCG and RSNA to get their "authorization" for the change. Id. While Defendants may not have lacked complete authority over the male CRNA's actions, the University had the ability to remove him from a supervisory role over Plaintiff and could thereby "exercise control over . . . supervision assignments." (Defs.' Br. (Doc. 9) at 13.) Thus, by communicating the issues to Dr. Shedlick, Plaintiff reported the harassment to "an official of the recipient entity with authority to take corrective action to end the discrimination." Gebser, 524 U.S. at 290.

Furthermore, Plaintiff asserts that Defendants "proceeded . . . to assign [Plaintiff] to the same male CRNA, even after she advised them in November 2016 of her continued hostile environment." (Pl.'s Resp. (Doc. 10) at 10 (emphasis added).) Plaintiff's repeated allegation that Defendants "assigned" her to the male CRNA, (id. at 2, 4, 10, 13; Compl. (Doc. 1) ¶¶ 37,

44, 54), also implies Defendants' substantial control over the harasser's supervisory role within the UNCG program.[7]

Defendants also had substantial control over the context in which the known harassment occurred. Plaintiff alleges that she was "assigned" to WakeMed by Defendants as part of her curriculum at UNCG. (Pl.'s Resp. (Doc. 10) at 2-3.) Her months-long presence at WakeMed was a direct part of her UNCG education and is reasonably inferred from the Complaint as a matter within the University's discretion. This alone means the Defendants could "influence the clinical work environment" — by all accounts, the University Defendants placed Plaintiff in that environment over other clinical offerings. Plaintiff suggests the availability of alternative offerings by faulting Defendants for "continuing to assign [Plaintiff] to perform clinical work at WakeMed hospital." (Compl. (Doc. 1) ¶ 54.) These facts, along with Dr. Shedlick's supervisory role and ability to restrict Plaintiff's contacts within the hospital, constitute plausible allegations of substantial control.

Finally, as is required for a deliberate indifference claim, Plaintiff plausibly alleges that she was left vulnerable

---

[7] While Defendants are correct that Plaintiff does not provide details about how the supervision program is orchestrated, taking all facts in the light most favorable to Plaintiff, she has clearly alleged that Defendants played a role in her assignments.

- 26 -

to harassment after her supervisors dismissed her initial complaints. When she reached out again to Drs. Shedlick and Stone on November 1, Plaintiff seems to indicate that the harassment had continued since her first complaint four months earlier, stating "[e]very encounter with [the male CRNA] has escalated, and the last encounter left [her] feeling sexually exploited for weeks." (Id. ¶ 45.) Contrary to Defendants' assertions, Plaintiff also alleges elsewhere that the harassment occurred "throughout the time [Plaintiff] performed her clinical work at WakeMed," (id. ¶ 38), referencing her "continued hostile environment" after complaining. (Pl.'s Resp. (Doc. 10) at 10 (emphasis added).)

Moreover, Davis does not require that a plaintiff be actually subjected to further harassment after her complaint, but rather that she be "[made] liable or vulnerable" to it. 526 U.S. at 645. Upon bringing the issue up with her supervisors again, Plaintiff was chastised and informed she would continue working with her harasser. (Compl. (Doc. 1) ¶ 46.) Despite Plaintiff's complaints, she alleges "no meaningful investigation . . . ever occurred." (Id. ¶ 43.) Plaintiff was subsequently assigned, by Defendants, to further shifts under the direct supervision of her harasser. (Id. ¶ 54.) Thus, Plaintiff has

plausibly alleged that Defendants, at a minimum, left her vulnerable to continued harassment.

Plaintiff has alleged facts to support all four elements of a sexual harassment claim, including the multiple prongs required to impute liability to Defendants. Thus, Defendants' motion to dismiss under Rule 12(b)(6) will be denied.

## 2. Claim Two: Retaliation for Reporting, Opposing and Attempting to Remedy a Sexually Hostile Educational Environment

Title IX includes an implied right of action protecting those who are retaliated against for reporting sexual discrimination. Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 183-84 (2005). Retaliation under Title IX occurs "when a funding recipient retaliates against a person because [s]he complains of sex discrimination, this constitutes intentional 'discrimination' 'on the basis of sex,' in violation of Title IX." Id. at 174. A prima facie retaliation claim must show (1) engagement in a protected activity; (2) an adverse action; and (3) a causal connection between the protected activity and the adverse action. See Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010) (applying this retaliation framework to Title VII claims); Goodman v. Archbishop Curley High Sch., Inc., 149 F. Supp. 3d 577, 582 (D. Md. 2016) (applying the framework

- 28 -

to Title IX claims); DeCecco v. Univ. of S.C., 918 F. Supp. 2d
471 (D.S.C. 2013) (same).

Defendants concede that Plaintiff's report of the
harassment constitutes protected activity. (Defs.' Br. (Doc. 9)
at 15.) Defendants instead dispute the latter two prongs of
Plaintiff's retaliation case, arguing that Plaintiff's dismissal[8]
was the only adverse action taken and was not causally connected
to her complaints. Id.

As a matter of purely temporal linkage, Plaintiff cannot
directly tie either dismissal with her complaints. Nearly two
years elapsed between Plaintiff's final complaint to Drs.
Shedlick and Stone in November 2016 and her initial dismissal
from the DNP Program in June 2018. (Compl. (Doc. 1) ¶¶ 45, 56.)
This period is too long to establish a temporal connection on
its own. See King v. Rumsfeld, 328 F.3d 145, 151 n.5 (4th Cir.
2003) (finding, in the Title VII context, that even two and a

_____

[8] Notably, Plaintiff was technically dismissed two times by
UNCG, once in June 2018 and again in February 2019 after her
reinstatement. (Compl. (Doc. 1) ¶¶ 56, 58.)

- 29 -

half months was probably too long a lapse in time, barring other circumstances to explain the gap).[9]

Plaintiff has a stronger temporal case tying her complaints to her supervisors' subsequent campaign against her, which itself may be considered an adverse action under Title IX. Feminist Majority Found., 911 F.3d, at 695 ("[R]etaliatory harassment can be a materially adverse action."). Though Plaintiff does not allege an exact date that her supervisors began pushing to have her expelled, it began sometime in 2017, possibly as soon as two months after her final complaint in November 2016. However, given Plaintiff does not allege when in 2017 Drs. Stone and Shedlick began mistreating her, temporal linkage on its own cannot lift her retaliation claim to the level of plausibility.

Even absent a perfect temporal link, the court may consider other evidence linking Plaintiff's complaints with her dismissal. Lettieri v. Equant Inc., 478 F.3d 640, 650 (4th Cir. 2007) (finding that, in the Title VII context, if a substantial amount of time passes between the protected activity and the

_____

[9] The Fourth Circuit has held that "Title VII, and the judicial interpretations of it, provide a persuasive body of standards to which [a court] may look in shaping the contours of a private right of action under Title IX." Preston v. Commonwealth of Va. ex rel. New River Cmty. Coll., 31 F.3d 203, 207 (4th Cir. 1994).

- 30 -

retaliatory conduct, "courts may look to the intervening period for other evidence of retaliatory animus").

Plaintiff has provided enough facts to plausibly allege that Dr. Shedlick and Dr. Stone's personal animus against Plaintiff stemmed from her complaints of sexual harassment. Plaintiff complained about the male CRNA during her very first month at WakeMed. (Compl. (Doc. 1) ¶¶ 37, 41.) Upon hearing Plaintiff's complaint, both supervisors "intentionally downplayed" the harassment and "pressured [Plaintiff] not to share her complaint with anyone else." (Id. ¶ 42.) When Plaintiff complained to WakeMed's Chief CRNA about the harassment in November 2016, Dr. Shedlick and Dr. Stone "reprimanded" Plaintiff for "going 'outside the chain of command'" and reporting the harassment above their heads. (Id. ¶¶ 44, 46.)

Thereafter, in 2017, Dr. Shedlick and Dr. Stone's attacks on Plaintiff began: Plaintiff alleges that during 2017 and 2018, both supervisors consistently tried to expel Plaintiff. (Id. ¶¶ 53, 54.) She also alleges that they fabricated documents and evidence to undermine Plaintiff's studies during this time period. (Id. 54.) Dr. Shedlick and Dr. Stone also falsely accused Plaintiff of not being "fit for duty" in the nursing program, "despite no medical evidence supporting their claims."

- 31 -

(Id.) Plaintiff alleges malicious conduct of this nature continued throughout 2017 and 2018. (Id.)

This conduct alone, given its spread-out timing over a two-year period, does not independently link Plaintiff's complaints with her dismissal. However, Plaintiff alleges that her supervisors made specific comments, both to her and to other students, that demonstrated these actions were motivated by retaliatory animus and intentionally aimed at expelling Plaintiff from the program.

For example, "on multiple occasions in 2017 and 2018," Dr. Shedlick and Dr. Stone "repeatedly advise[d] students that they were doing everything they could to have Ms. Davis dismissed from the DNP program." (Id.) This directly links Plaintiff's dismissal with her supervisors' hostile conduct throughout 2017 and 2018. Dr. Shedlick and Dr. Stone also made "multiple" comments to Plaintiff indicating that if they couldn't "get rid of [her]" for one thing, they would find a way to "get rid of [her] for something else." (Id. ¶ 55.) Once again, this clearly connects Plaintiff's dismissal with Dr. Shedlick and Dr. Stone's ongoing animus against her throughout 2017 and 2018. Finally, Plaintiff also alleges that both supervisors outright "threatened to have [Plaintiff] dismissed from the DNP program

- 32 -

if she complained about any of their conduct towards her."[10] (Id. ¶ 50.) Plaintiff does not allege any hostile conduct of this nature until after her harassment complaint.

Taking facts in the light most favorable to Plaintiff, the comments attributed to Dr. Stone and Dr. Shedlick illustrate a coordinated plan to expel Plaintiff that began after she complained to them about harassment a second time. As Defendants argue, this plan may have stemmed merely from unrelated personal animus. (Defs.' Reply (Doc. 11) at 9.) However, at this stage in the pleading, Plaintiff has plausibly alleged that this campaign to dismiss her was connected to her harassment reporting.

## C. Claim Six: ADA Violations

### 1. Disability Discrimination

Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. In order to state a claim under the ADA, Plaintiff must allege that (1) she has a disability, (2) she is otherwise qualified to receive

---

[10] Plaintiff references this comment when discussing Plaintiff's ADA claims, however, Plaintiff seems to allege it related to all of Dr. Shedlick and Dr. Stone's retaliatory conduct. (Compl. (Doc. 1) ¶¶ 52, 53.)

the benefits of a public service, program, or activity, and (3)
she was excluded from participation in or denied the benefits of
such service, program, or activity, or otherwise discriminated
against, on the basis of her disability. Constantine v. Rectors
& Visitors of George Mason Univ., 411 F.3d 474, 498 (4th Cir.
2005); Baird ex rel. Baird v. Rose, 192 F.3d 462, 467-70 (4th
Cir. 1999).

Defendants do not dispute that Plaintiff has a disability.
(Defs.' Br. (Doc. 9) at 19.) To fulfill the second prong,
Plaintiff must allege that she was qualified for the educational
program so long as UNCG provided reasonable accommodations to
ensure her success. See Halpern v. Wake Forest Univ. Health
Sciences, 669 F.3d 454, 462 (4th Cir. 2012). Plaintiff
requested, and received, reasonable accommodations from the
University, including "extended time for completing exams and a
quiet testing environment." (Pl.'s Resp. (Doc. 10) at 3); see
Constantine, 411 F.3d at 488 (holding that institutions must
make "reasonable accommodations for disabled students to ensure
that they are able to participate in the educational program").
While Plaintiff alleges that Dr. Shedlick and Dr. Stone "mocked"
her ADHD and threatened to dismiss her from the program, these
facts do not materially affect the actual accommodations of

- 34 -

extended time and a quiet testing environment. (Pl.'s Resp. (Doc. 10) at 4.)

Plaintiff does allege that Shedlick and Stone "interfered . . . by repeatedly interrupting her during testing and ensuring Plaintiff lacked a quiet test-taking environment." (Id. at 3-4.) Plaintiff does not allege when or how often these interruptions occurred, or how severely they affected her quiet environment. Nor does she allege any facts indicating that these interruptions affected her test-taking performance. This single fact is the sole allegation that Plaintiff's accommodations were anything short of reasonable.

Plaintiff cites Constantine, 411 F.3d 474, as support for her allegation of disability discrimination; however, the student in that case was denied the opportunity to re-take an exam after her disability prevented her from taking it on time. 411 F.3d at 499. Though the student was eventually allowed to re-take the test, she was given only three days to prepare and received a failing grade, ultimately preventing her graduation. Id. Plaintiff was not prevented from taking exams, nor was she outright denied extra time or quiet test-taking rooms. (Compl. (Doc. 1) ¶ 49.) Plaintiff does claim that her supervisors sometimes interrupted her, (id.), but the vague interruptions alleged are a far cry from the severity of Constantine. As

- 35 -

Defendants note, Plaintiff fails to allege that she was "excluded from the DNP program or was even prevented from advancing within it – either as a result of failed examinations, poor academic performance, or some other reason – because she has ADHD or because certain individuals frustrated the approved accommodations." (Defs.' Br. (Doc. 9) at 19–20.) In fact, Plaintiff specifically alleges she was dismissed from the program for non-academic reasons. (Compl. (Doc. 1) ¶ 56.)

Thus, Plaintiff has failed to allege facts that suggest "more than a sheer possibility" that Defendants failed to provide reasonable accommodations. Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556–57). Nor does Plaintiff provide any additional facts to suggest that she was dismissed from the program specifically due to her ADHD. (See Compl. (Doc. 1) ¶ 135.) Plaintiff's ADA claim will therefore be dismissed pursuant to Rule 12(b)(6).

### 2. Retaliation under the ADA

Plaintiff also alleges a claim of retaliation under the ADA.[11] In order to plausibly state a claim of retaliation under the ADA, a plaintiff must allege "(1) that she has engaged in

---

[11] Plaintiff does not clearly set apart retaliation under the ADA as a separate claim in her Complaint. However, the court will assess the claim anyway, as it is loosely alleged in a paragraph under the ADA claim heading. (Compl. (Doc. 1) ¶ 135.)

conduct protected by the ADA; (2) that she suffered an adverse action subsequent to engaging in the protected conduct; and (3) that there was a causal link between the protected activity and the adverse action." Freilich v. Upper Chesapeake Health, Inc., 313 F.3d 205, 216 (4th Cir. 2002).

Plaintiff alleges she complained to UNCG's Office of Accessibility and Resources Services ("OARS"). (Compl. (Doc. 1) ¶ 51.) This constitutes a protected activity under the ADA. Morris v. BellSouth Telecomms., Inc., 302 F. Supp. 2d 515, 521 (M.D.N.C. 2004) (holding that a protected activity includes "openly oppos[ing] . . . [discrimination] in any way or . . . hav[ing] made a charge, participated in an investigation, etc."). Plaintiff's request for exam accommodations was also a protected activity under the ADA. Haulbrook v. Michelin N. Am., Inc., 252 F.3d 696, 706 (4th Cir. 2001) (finding a plaintiff's request for reasonable accommodations constitutes a protected activity under the ADA). The first element of retaliation is therefore satisfied.

Second, Plaintiff was ultimately dismissed from the DNP program, which constitutes an adverse action. (Compl. (Doc. 1) ¶ 135; see Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (defining an adverse action as one which "a reasonable [person] would have found . . . materially adverse, [i.e., one

- 37 -

which] might have dissuaded a reasonable [person] from making or supporting a charge of discrimination"); Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 577 (4th Cir. 2015) (noting that firing an employee "clearly" constitutes an adverse action under the ADA").)

Plaintiff's claim fails at the third element of retaliation. While her supervisors did threaten potential retaliation if Plaintiff complained, (Compl. (Doc. 1) ¶ 50), Plaintiff has failed to plausibly allege that (1) Drs. Shedlick and Stone knew she complained, or (2) that the supervisors' hostile conduct began or escalated in response to the disability discrimination complaint. First, it is not alleged that the supervisors who arranged her dismissal even knew of her OARS complaint regarding their activity. See Graves v. Bank of Am., N.A., 54 F. Supp. 3d 434, 443 (M.D.N.C. 2014) (finding that in the Title VII context, "[e]mployer knowledge of an EEOC charge is 'absolutely necessary' for a finding of retaliation" (citing Dowe v. Total Action Against Poverty, 145 F.3d 653, 657 (4th Cir. 1998))).

This distinguishes her disability discrimination complaint from her sexual harassment complaints, in which Plaintiff reported directly to the supervisors who began to retaliate against her. (Compl. (Doc. 1) ¶¶ 42, 45.)

- 38 -

Moreover, the lack of a date for the OARS complaint makes it impossible to draw sufficient temporal linkage between the complaint and Plaintiff's dismissal. Plaintiff alleges general dates demonstrating that her supervisors began treating her poorly after she complained twice about sexual harassment. (Id. ¶¶ 42, 45, 53.) However, Plaintiff fails to adequately place her OARS complaint on this timeline. Plaintiff's failure to allege an approximate date for her OARS complaint makes it entirely possible that Plaintiff reported disability discrimination well after her supervisors' two-year "near daily campaign to inflict maximum harm on Ms. Davis" was already underway. (Id. ¶ 53.) For these reasons, Plaintiff is unable to plausibly allege a sufficient causal link between her dismissal and her OARS complaint.

D. **Claim Seven: Rehabilitation Act**

Finally, Plaintiff brings a claim under § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, which operates similarly to the ADA. The Rehabilitation Act differs from the ADA only "with respect to the third element, causation. To succeed on a claim under the Rehabilitation Act, the plaintiff must establish [s]he was excluded 'solely by reason of' [her] disability," a stricter standard than that imposed by the ADA. Halpern, 669 F.3d at 461-62 (4th Cir. 2012) (quoting Baird ex

- 39 -

rel. Baird, 192 F.3d at 468–69). Defendants argue that Plaintiff's allegations here mirror her ADA arguments and should be dismissed for the same reasons. (Defs.' Br. (Doc. 9) at 22–23.) Once again, Plaintiff has failed to demonstrate how Defendants failed to provide reasonable accommodations in a way that denied her the benefits of the university education. Plaintiff only alleges interruptions by supervisors, without indicating how often those interruptions occurred or whether those interruptions impacted her ability to complete the exams. (Compl. (Doc. 1) ¶ 49.) Given Plaintiff was dismissed for nonacademic reasons, it is not alleged that any failures on these exams contributed to her dismissal from the program. (Id. ¶ 56.)

Plaintiff also alleges retaliation under the Rehabilitation Act. (Id. ¶ 145.) However, Defendants correctly point out that "the same temporal proximity problems that prevent the drawing of the inference of causation for her ADA claim also doom Plaintiff's claim for retaliation under the Rehabilitation Act." (Defs.' Br. (Doc. 9) at 23.) Given that the Rehabilitation Act requires even stronger causal links than Plaintiff's ADA claim, Plaintiff's Rehabilitation Act claims will be dismissed pursuant to Rule 12(b)(6).

## IV. CONCLUSION

For the aforementioned reasons, this court will grant in part and deny in part the Motion to Dismiss filed by Defendants University of North Carolina at Greensboro and the Board of Governors of the University of North Carolina.

**IT IS THEREFORE ORDERED** that Defendants' Motion to Dismiss, (Doc. 8), is **GRANTED IN PART AND DENIED IN PART**. The motion is **GRANTED** as to Claims Three, Four, Five, and Eight and these claims are **DISMISSED WITHOUT PREJUDICE** pursuant to Fed. R. Civ. P. 12(b)(1). The motion is **GRANTED** as to Claims Six and Seven and these claims are **DISMISSED WITHOUT PREJUDICE** pursuant to Fed. R. Civ. P. 12(b)(6). The motion is **DENIED** regarding Claims One and Two.

This the 29th day of September, 2020.

William L. Osteen, Jr.
United States District Judge

- 41 -